UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————————

ANTHONY FABIAN,

                              Plaintiff,

                                                    9:16-CV-00022
v.
                                                    (TJM/TWD)

DUBREY, et al.,

                              Defendants.

———————————————————————————————

APPEARANCES:                                OF COUNSEL:

ANTHONY FABIAN
Plaintiff, *pro se*
275 Westwood Ave.
Apt. 6-D
Staten Island, NY 10314

HON. ERIC T. SCHNEIDERMAN                   NICOLE E. HAIMSON, ESQ.
Attorney General of the State of New York   Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

       Plaintiff Anthony Fabian, a former inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this *pro se*

civil rights action pursuant to 42 U.S.C. § 1983 on January 7, 2016, alleging numerous violations

of his constitutional rights while incarcerated at Clinton Correctional Facility ("Clinton").  (Dkt.

No. 1.)  Plaintiff's amended complaint, the operative pleading, was accepted for filing on March

30, 2016.  (Dkt. No. 16.)  Only Plaintiff's Eighth Amendment excessive force claim against

Defendant Corrections Officers C. DuBrey ("DuBrey"), S. Dukett[1] ("Dukett"), M. LaMountain ("LaMountain"), and J. Collins ("Collins") survived initial review pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A. (Dkt. No. 15.) DuBrey, Dukett, and LaMountain filed their answer to the amended complaint on May 25, 2016. (Dkt. No. 22.) To date, Collins has not been served.

DuBrey has now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that he was not personally involved in any use of force on Plaintiff on January 8, 2013. (Dkt. No. 27.) Plaintiff has not opposed the motion. For the reasons set forth below, it is recommended that DuBrey's motion for summary judgment be denied.

## I.     FACTUAL BACKGROUND

### A.     Plaintiff's Allegations

In his verified amended complaint, Plaintiff alleges that on January 8, 2013, at 7:00 p.m., Plaintiff and several other inmates housed on the B-6 Company at Clinton were released from their cells for evening recreation. (Dkt. No. 16 at 6-7.[2]) Plaintiff proceeded to exit the gallery. *Id*. at 7. When Plaintiff reached the end of the gallery, however, Collins instructed Plaintiff to step out of line. *Id*. As Plaintiff complied, LaMountain approached Plaintiff (from a group of five or six officers, one of which was DuBrey) and directed Plaintiff to face the wall while the other prisoners exited the area. *Id*. LaMountain put his face near Plaintiff's ear and asked, "[d]o you have anything in your cell you want to tell us about before you get a beatdown?" *Id*.

---

[1] The clerk is directed to amend the caption to reflect the correct spelling of Defendant's surname, "Dukett." (*See* Dkt. Nos. 11, 16, and 22.)

[2] Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

Plaintiff responded, "I don't know what your [sic] talking about." *Id.* LaMountain repeated his question while Dukett, DuBrey, and Collins approached Plaintiff. *Id.* LaMountain instructed Plaintiff to spread his legs for a pat frisk. *Id.* As Plaintiff complied, Dukett struck Plaintiff on the right side of his head and ear causing Plaintiff to become disoriented. *Id.* at 8. LaMountain, Dukett, Collins, and DuBrey "began speaking words to the effect of, 'he needs a beatdown,' and said officers then struck, shoved, [and] punched" Plaintiff. *Id.* During this assault, Plaintiff attempted to turn away from the wall to defend himself. *Id.* As a result, "the officers became more aggressive, eventually driving [Plaintiff] to the floor." *Id.*

The officers tried to put wrist restraints on Plaintiff but he resisted out of "fear for his safety." *Id.* Unable to apply the wrist restraints, the officers dragged and locked Plaintiff in a gated slop-sink room. *Id.* The officers left Plaintiff locked in the room and, upon information and belief, LaMountain and Dukett proceeded to search Plaintiff's cell. *Id.* at 9.

Approximately forty-five minutes later the "above officers" returned to the gated slop-sink room and began to strike, kick, and punch Plaintiff. *Id.* LaMountain rested his weight upon Plaintiff's lower spine and the officers applied wrist restraints. *Id.* at 13. Sergeant Wood[3] was radioed to the area. *Id.* at 9. According to Plaintiff, at approximately 8:15 p.m., Sergeant Wood arrived and ordered DuBrey to escort Plaintiff to the facility emergency room ("ER") for assessment and treatment. *Id.* at 13. Plaintiff alleges a spinal injury, trauma to his right leg and knee, multiple bruises, contusions, and abrasions. *Id.*

---

[3] Plaintiff's Eighth Amendment failure to intervene and supervisory claims against Sergeant Wood were dismissed without prejudice for failure to state a claim pursuant to 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(b). (Dkt. No. 15 at 9-10, 13-14.)

### B. Plaintiff's Deposition Testimony

Plaintiff was deposed on November 4, 2016. (Dkt. No. 27-5 at 30-165.) Plaintiff

testified that on January 8, 2013, he was assaulted by LaMountain, Dukett, DuBrey, Collins,[4]

and another officer that he has been unable to identify. *Id*. at 61-62. Plaintiff testified that

DuBrey and Dukett are "partners" that work in the gymnasium:

> Q: For DuBrey, the person that you said worked in the gym,
> where did you get his name from?
> A: I can't tell you that.
>
> Q: From another inmate?
> A: Of course.
>
> Q: How about Dukett, where did you get his name from?
> A: Inmate.

*Id*. at 60, 126. Plaintiff confirmed that DuBrey was not regularly assigned to work on his cell

block. *Id*. at 57. However, on January 8, 2013, as he was walking to attend evening recreation,

DuBrey stated, "Fabian, you're not going out to the yard today." *Id*. at 67-68. Plaintiff further

testified that after being struck by LaMountain, "the other two that work in the gym, they threw

me up against the ground and started stomping me out." *Id*. at 81-82. Plaintiff explained that

DuBrey and Dukett were "kicking [him] with their boots." *Id*. at 82. Plaintiff testified:

> Q: So you say DuBrey and Dukett kicked you about four or five
> times each, right, in the back?
> A: Yes.
>
> Q: How hard were those kicks?
> A: Real hard.
>
> Q: Scale of, like, one to ten?
> A: A nine.

---

[4] The Court will continue to refer to this Defendant as "Collins" even though the transcript reads "Colline." (Dkt. No. 27-5 at 30-165.)

*Id.* at 85.

However, as to his claim that DuBrey kicked him four or five times, Plaintiff also

testified:

> The truth is that when they threw me on the floor – understand,
> because I had both of my hands in the bottom. They started
> kicking me out of nowhere, but I couldn't see them because they
> had my head on the floor, so I kind of figured at the time that it
> was one of them.

*Id.* at 133-34 (unaltered text). Plaintiff testified that after his wrists were restrained behind his

back, DuBrey and LaMountain assisted Plaintiff to his feet. *Id.* at 93-94. Notably, as to

DuBrey's personal involvement, Plaintiff testified as follows:

> Q: Isn't it true that DuBrey actually never touched you, he never
> kicked you as you say?
> A: Yes, he did.
>
> Q: Isn't it true that he actually only came in after this incident and
> escorted you to medical?
> A: No, he didn't.
>
> Q: Okay. Did he frisk you after the weapon was found?
> A: Yup.
>
> Q: Did he put you in the boss chair?
> A: He never – I never got put on the boss chair.

*Id.* at 126-27.

### C. Unusual Incident Report

The Unusual Incident Report (UI # 13-0011) prepared by Superintendent LaValley[5] in

connection with the January 8, 2013, incident states that Sergeant Wood authorized a cell frisk of

Plaintiff's cell (B-6-21), and that "while watching the frisk from outside of the cell, [Plaintiff]

---

[5] All claims against Superintendent LaValley were *sua sponte* dismissed without prejudice upon
initial review of Plaintiff's original complaint. (Dkt. No. 4.)

became disruptive." (Dkt. No. 27-2 at 6.) LaMountain removed Plaintiff from that area to the end of the B-6 Company. *Id*. Dukett continued the frisk. *Id*. Dukett found a metal weapon inside a bucket under Plaintiff's bed. *Id*. As Dukett exited the cell with the bucket and weapon, Plaintiff turned off the wall in an aggressive manner towards LaMountain. *Id*. A use of force ensued. *Id*. Specifically, LaMountain used closed fist punches to Plaintiff's back area and Dukett and LaMountain each used body holds to gain control of Plaintiff. *Id*.

Thereafter, Sergeant Wood was notified and reported to the area. *Id*. at 7. Plaintiff was escorted to the facility hospital. *Id*. Plaintiff was "pat frisked, hand scanned, boss chaired, and strip frisked, per Sergeant Wood – no contraband found." *Id*. (unaltered text). Plaintiff was seen by medical with the following noted: "bruising side of left eye, redness right side of forehead, red mark right side of neck, multiple red marks on right side of back, and minor abrasion to right knee." *Id*. Plaintiff was moved from cell B-6-21 to D-3-38. *Id*.

### D.      Use of Force Report

A Use of Force Report (UOF # 13-0003) reported by Sergeant Wood and signed by Superintendent LaValley in connection with the January 8, 2013, incident states that while Dukett and LaMountain were performing an authorized search of Plaintiff's cell (B-6-21) a weapon was found in a white water bucket located under Plaintiff's bed near the sink area. (Dkt No. 27-2 at 10.) As the search progressed, LaMountain observed Plaintiff becoming "agitated" as Dukett moved "closer to where the weapon was located in the cell." *Id*. LaMountain escorted Plaintiff to the end of the B-6 Company and ordered Plaintiff to place his hands on the wall. *Id*. "A short time later," Dukett walked to the end of the B-6 Company carrying the white water bucket. *Id*. Plaintiff "observed the white bucket and immediately pushed off the wall to his right in an aggressive manner." *Id*. A use of force ensued. *Id*.

The report indicates that LaMountain grabbed Plaintiff by the hood of his sweatshirt and "forced him back onto the wall." *Id*. LaMountain, while still holding the hood of Plaintiff's sweatshirt, forcefully took Plaintiff to the ground face first. *Id*. Plaintiff continued to fight and struggle. *Id*. LaMountain used his right fist to strike Plaintiff several times to the left of his back. *Id*. Plaintiff continued to struggle. *Id*. LaMountain then placed his left knee in the small portion of Plaintiff's back and then using both of his hands, forced Plaintiff's right wrist behind his back. *Id*. Dukett grabbed Plaintiff's left wrist and forced it behind his back. *Id*. LaMountain applied mechanical wrist restraints and assisted Plaintiff to his feet. *Id*. The use of force ended. *Id*.

The report describes Plaintiff's injuries as: "bruising at side of left eye, red area right side of forehead, red mark right side of neck extending to middle of neck, multiple red marks on right side of back, and minor abrasion to right knee." *Id*. at 11.

### E.     DuBrey's Interdepartmental Communication

By internal memorandum dated January 8, 2013, to Sergeant Wood (subject: UI # 13-0011, UOF # 13-003, escort of [Plaintiff]), DuBrey stated that at approximately 7:29 p.m. on January 8, 2013, he was directed to report to B-Block to escort Plaintiff from B-Block to the facility ER. *Id*. at 13. After escorting Plaintiff to the ER without incident, DuBrey "performed a pat frisk, hand scan, BOSS chair, and strip frisk with negative results." *Id*. Plaintiff was seen by medical and mental health staff. *Id*. Thereafter, DuBrey escorted Plaintiff to the D-Block without incident. *Id*. The memorandum indicates that "all escorts were done under supervision of Sergeant Wood without incident." *Id*.

## II.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."  *Id.* (citation and internal quotation marks omitted).  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id.* (citation and internal quotation marks omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)[6] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When a party fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are undisputed in the record; and (2) assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the moving party. *Id.*; *see also Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001).

## III. COMPLIANCE WITH LOCAL RULE 7.1

The Local Rules provide a mechanism for the efficient resolution of summary judgment motions. *See* L.R. 7.1(a)(3). This mechanism places the burden on the parties to marshal the evidence either in support of, or in opposition to, the motion. In this regard, Local Rule 7.1(a)(3) requires a party moving for summary judgment to submit a Statement of Material Facts, which:

> shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions,

---

[6] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

> answers to interrogatories, admissions and affidavits.  It does not,
> however, include attorney's affidavits.

*Id*.

Further, to ensure compliance with this policy of efficient resolution, Local Rule 7.1(a)(3) provides that "[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."  *Id*.  In the event that the moving party fails to comply with Local Rule 7.1(a)(3), the Court is not required to conduct its own review of the record in support of movant's factual assertions.  *See Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.").

Here, DuBrey has failed to annex the Statement of Material Facts to his motion.  (*See* Dkt. No. 27.[7])  The Second Circuit has ruled, however, that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of, and response to, statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).  Because it appears that DuBrey's failure to file the Statement of Material Facts was an inadvertent omission, the Court has opted to review the entire record in determining if there are material facts in dispute.

---

[7]  The notice of motion indicates that "upon the annexed declarations of [Assistant Attorney General], Craig DuBrey, Christopher Retrosi and Ronald G. Wood, the Statement of Material Facts, the Memorandum of Law, and upon all prior proceedings, Defendant Craig DuBrey . . . will make a motion . . . pursuant to Rule 56 of the Federal Rules of Civil Procedure[.]"  (Dkt. No. 27.)  With the exception of the Statement of Material Facts, all documents were annexed to the motion.

Further, because Plaintiff's amended complaint is verified, it will be treated as an affidavit in opposition to DuBrey's motion. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied on to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that the plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922, 122 S. Ct. 2586 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") (citations omitted).

## IV.     DISCUSSION

DuBrey contends summary judgment is warranted because no reasonable factfinder could conclude that he was personally involved in the alleged unconstitutional act. (Dkt. No. 27-1 at 10-11.) The Court disagrees.

### A.     Legal Standard

It is well-established that "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under § 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). To prevail on a § 1983 cause of action against an individual, a plaintiff must show a "tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior

is actionable under law." *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL

1638242, at *14 (N.D.N.Y. Feb. 26, 2016) (quoting *Hendrickson v. U.S. Attorney Gen.*, No. 91-

CV-8135 (LMM), 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994)), *adopted by* 2016 WL

1639904 (N.D.N.Y. Apr. 25, 2016).

A personal involvement inquiring on summary judgment "examines only whether there is

record evidence to support a factfinder's conclusion that the individual under consideration was

involved in the alleged conduct." *Id.*

### B. Analysis

In his verified amended complaint, Plaintiff alleges that on January 8, 2013, DuBrey,

LaMountain, Dukett, and Collins subjected him to excessive force in violation of the Eighth

Amendment. (Dkt. No. 16 at 8-9.) Specifically, Plaintiff claims that DuBrey was one of several

officers that assaulted him on January 8, 2013, by striking, kicking, and punching him. *Id.*

Plaintiff claims that DuBrey told him, "Fabian, your [sic] not going out to the yard today." *Id.* at

9; *see also* Dkt. No. 27-5 at 67-68. Plaintiff testified that DuBrey was on the B-Block at the time

of the incident and that DuBrey kicked him four or five times in the back. (Dkt. No. 27-5 at 57,

60, 83, 126-27.) Plaintiff claims that after the assault, DuBrey helped Plaintiff to his feet. *Id.* at

93-94.

DuBrey flatly contradicts Plaintiff's version of the events. DuBrey declares that on

January 8, 2013, he was not assigned to the B-Block. (Dkt. No. 27-2 at ¶ 15.) DuBrey declares

that he was not present during the search of Plaintiff's cell, during the use of force, or when

mechanical restraints were applied on Plaintiff. *Id.* at ¶ 14. DuBrey states that at approximately

7:20 p.m., he was directed by Sergeant Wood to report to the B-Block to escort Plaintiff to the

facility ER for medical attention after the use of force occurred. *Id.* at ¶ 16. DuBrey declares

that he escorted Plaintiff to the ER without incident. *Id*. at ¶ 17. While at the ER, DuBrey "performed a pat frisk, hand scan, BOSS chair, and strip frisk on [P]laintiff with negative results. *Id*. at ¶ 18. Significantly, DuBrey declares that "[a]t no time have I ever struck [P]laintiff in his head, punched, kicked or assaulted him in any way, nor did I witness [P]laintiff get assaulted by any other DOCCS employee on January 8, 2013, or any other day." *Id*. at ¶ 21.

To be sure, DuBrey has marshalled persuasive evidence in support of his motion for summary judgment. Sergeant Wood and Christopher D. Retrosi, Senior Investigator in the Office of Special Investigations ("OSI"), previously known as the Office of Inspector General, have also submitted declarations in support of DuBrey's motion. (Dkt. Nos. 27-3 and 27-4.)

Sergeant Wood declares that on January 8, 2013, he authorized a cell frisk on Plaintiff's cell in the B-Block. *Id*. at ¶ 5.[8] At approximately 7:20 p.m., Sergeant Wood responded to the B-Block, was told the results of Plaintiff's cell search, and was notified that a use of force had ensued with Plaintiff. *Id*. at ¶ 6.

Sergeant Wood declares that he directed LaMountain and Dukett to report to the facility hospital for assessment and treatment. *Id*. at ¶ 12. As to DuBrey's involvement in the use of force, Sergeant Wood declares that he directed DuBrey, "who was not involved in the incident, to report to B-Block and escort Plaintiff to the facility ER for assessment and treatment." *Id*. at ¶ 13. Sergeant Wood supervised both escorts by DuBrey, which occurred without incident. *Id*. at ¶ 16. In his declaration, Sergeant Wood explains that:

> After force is used to subdue an inmate and resolve an incident, the immediate goal is to de-escalate the situation and provide medical attention to both staff members and the inmate involved.

---

[8] Attached to Sergeant Wood's declaration is an Interdepartmental Communication subject UI #13-0011, UOF #13-0003. (Dkt. No. 27-3 at 6-7.)

It is the facility's policy and procedure that once a use of force has ended, staff members not involved in the use of force are called upon to take custody and control of the inmate.

This practice allows the staff members involved in a use of force to seek medical attention and aides [sic] in de-escalating the incident.

Once the new staff members have custody and control of the inmate, they are responsible for escorting the inmate as directed, for example, to the medical facility for attention and then to the inmate's cell.

*Id*. at ¶¶ 18-21.

Indeed, Sergeant Wood declares that he directed "DuBrey to take control of [Plaintiff] after the use of force incident and escort him to the medical unit, and then to his cell, *because* he was not involved in the use of force." *Id*. at ¶ 22.

Senior Investigator Retrosi states that on March 20, 2013, the OSI received a letter of complaint from Plaintiff, claiming that on January 8, 2013, he was assaulted by five or six officers at Clinton. (Dkt. No. 27-4 at ¶ 5.) Retrosi was assigned to investigate Plaintiff's claim of assault. *Id*. at ¶ 7.

Retrosi began his investigation on March 21, 2013, by gathering relevant documentary evidence, including medical records, disciplinary records, hearing tapes, and employee memoranda. *Id*. at ¶ 8. Retrosi learned that an incident took place on January 8, 2013, at Clinton wherein force was used on Plaintiff. *Id*. at ¶ 12. The Unusual Incident Report and Use of Force Report documented the incident, the staff members involved, and the type of force that was used. *Id*.

On March 27, 2013, Retrosi interviewed Plaintiff at Upstate Correctional Facility. *Id*. at ¶ 9. During the interview, although Plaintiff claimed he was assaulted by numerous officers on January 8, 2013, at no time did Plaintiff allege that DuBrey was one of the officers that assaulted

him. *Id*. ¶ 10. In fact, the only time Plaintiff mentioned DuBrey was in regard to Plaintiff's

property being moved from his old cell to his new cell after the incident. *Id*. at ¶ 11.

Based upon his investigation, Retrosi concluded that "DuBrey was not involved in any

use of force" on Plaintiff and that DuBrey "was merely the officer that escorted Plaintiff to the

facility emergency room for assessment and treatment *after* the use of force occurred and to his

new cell." *Id*. at ¶¶ 13-14. Retrosi concluded his investigation on July 6, 2013, and prepared a

final report, finding Plaintiff's claims of excessive force to be unsubstantiated. *Id*. at ¶ 16.[9]

Further, as set forth above, the Unusual Incident Report and Use of Force Report indicate

that on January 8, 2013, LaMountain and Dukett used force on Plaintiff and that Plaintiff

sustained injuries. (Dkt. No. 27-2 at 6-11.) Neither of those reports reference DuBrey. Plaintiff

has also submitted relevant portions of the B-Block log, which indicates that LaMountain and

Dukett were tasked with searching Plaintiff's cell on January 8, 2013. (Dkt. No. 27-5 at 28.)

Given these conflicting versions of events, the Court is called upon to weigh the parties'

credibility. "In general, of course, '[c]redibility determinations . . . are jury functions, not those

of a judge." *DeBlasio v. Rock*, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *13

(N.D.N.Y. Sept. 26, 2011) (quoting *Liberty Lobby*, 477 U.S. at 255); *see also Rule v. Brine*, 85

F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting

versions of the events are matter for the jury, not for the court on summary judgment.").

There is, however, a "narrow exception" to the general rule that credibility

determinations are not to be made on summary judgment. *Jeffreys*, 426 F.3d at 554; *Blake v.*

*Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007). Under this exception, in the "rare

circumstance where the plaintiff relies almost exclusively on his own testimony, much of which

---

[9] A copy of the final report, however, was not attached to Retrosi's declaration.

is contradictory and incomplete" and the plaintiff's evidence is contradicted by evidence produced by the defendants, the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys*, 426 F.3d at 554.

Here, DuBrey invites the Court to apply this narrow exception because "there is no evidence in the record to support the assertion that [he] was involved in a use of force incident on Plaintiff on January 8, 2013[,] other than Plaintiff's own allegations." (Dkt. No. 27-1 at 10.) DuBrey maintains that "[w]here a plaintiff relies almost exclusively on his own testimony, the Court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's version of events." *Id*. at 11 (citing *Jeffreys*, 426 F.3d at 555).

Here, although Plaintiff is relying exclusively on his own testimony and his evidence is contradicted by evidence produced by DuBrey, the Court finds the *Jeffreys* exception does not apply because Plaintiff's testimony is not "contradictory and incomplete." *See Jeffreys*, 426 F. 3d at 552. In *Jeffreys*, the plaintiff's claim that he was thrown out of a third-story window by police officers was vitiated by his three prior statements that he had jumped out the window. *Id*. Here, in contrast, Plaintiff has been consistent about DuBrey's personal involvement in the assault.[10]

As discussed above, according to Plaintiff's verified amended complaint and deposition testimony, DuBrey was not only present during the January 8, 2013, assault, but DuBrey was one of the officers that subjected Plaintiff to the excessive force. DuBrey has acknowledged as much in his memorandum of law:

> Plaintiff testified at his deposition that defendant DuBrey was on
> the B-Block during the use of force incident with LaMountain and

---

[10]  Because DuBrey is moving for summary judgment solely on the grounds of personal involvement, the Court expresses no opinion as to whether or not the *Jeffreys* exception would apply to the merits of Plaintiff's excessive force claim, which is not presently before the Court.

Dukett.  Plaintiff also testified that defendant DuBrey use [sic] force on him and assaulted him at the same time as LaMountain and Dukett.

Dkt. No. 27-1 at 10 (citations omitted).

In light of the record evidence, resolving all ambiguities and drawing all inferences in a light most favorable to Plaintiff, a reasonable factfinder could conclude, if Plaintiff's deposition testimony is credited, that DuBrey was personally involved in the January 8, 2013, use of excessive force.  Accordingly, it is recommended that DuBrey's motion for summary judgment for lack of personal involvement be denied.

## V.    CONCLUSION

Based on the above, the Court finds a genuine dispute of material fact regarding whether DuBrey was personally involved in the Eighth Amendment excessive force claim asserted by Plaintiff.  Therefore, the Court recommends denying DuBrey's motion for summary judgment.

**WHEREFORE,** it is hereby

**RECOMMENDED** that Defendant Craig DuBrey's motion for summary judgment (Dkt. No. 27) be **DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk amend the caption in this action so that the name of "Duckett" reads "Dukett."

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 13, 2017
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[11]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1638242
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chamma K. Brandon, Plaintiff,

v.

Dr. Glen Schroyer, et al., Defendants.

Civil Action No. 9:13-CV-0939 (TJM/DEP)
|
Signed February 26, 2016

**Attorneys and Law Firms**

FOR PLAINTIFF: CHAMMA K. BRANDON, Pro se,
12-A-5715, Sing Sing Correctional Facility, 354 Hunter
Street, Ossining, NY 10562.

FOR DEFENDANT SCHROYER: THUILLEZ,
FORD, GOLD, BUTLER & MONROE, LLP, 20
Corporate Woods Blvd., 3rd Floor, OF COUNSEL:
KELLY M. MONROE, ESQ., MOLLY C. CASEY,
ESQ., Albany, NY 12211.

FOR REMAINING DEFENDANTS: LEMIRE,
JOHNSON & HIGGINS, LLC, P.O. Box 2485, 2534
Route 9, OF COUNSEL: BRADLEY J. STEVENS,
ESQ., Malta, NY 12020.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is an action brought by *pro se* plaintiff Chamma
K. Brandon, a prison inmate formerly confined in the
Clinton County Jail ("CCJ"), pursuant to 42 U.S.C. §§
1983, 1985, and 1986, against several individuals working
at the facility alleging that they deprived him of his
civil rights during his period of incarceration there.
Plaintiff's claims fall into three groups, complaining of (1)
a one-month hiatus in a low-fat, low-cholesterol ("heart-
healthy") diet; (2) the failure to honor his religious diet
by serving him pork products; and (3) the failure to
otherwise accommodate his religious beliefs as a Muslim.
Plaintiff contends that, by their actions, defendants
violated his rights under the First, Eighth, and Fourteenth
Amendments to the United States Constitution, as well as
the Religious Land Use and Institutionalized Persons Act
of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc.

Now that discovery in the action is complete, all of
the defendants, including Dr. Glen Schroyer, who is
separately represented, have moved for the entry of
summary judgment dismissing plaintiff's claims. For the
reasons set forth below, I recommend that the motions be
granted in part but otherwise denied.

I. *BACKGROUND*

Plaintiff was confined in the CCJ beginning on January
14, 2012, and again following his re-arrest on March 2,
2012, until December 28, 2012, when he was transferred
into the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS").
*Dkt. No. 17 at 3,* 12–, 3. Upon his entry into the
CCJ for the first time in January 2012, Brandon was
five-feet, eleven-inches in height, weighed 250 pounds,
and was considered clinically obese. [1] *Dkt. No. 77–
6 at 2; Dkt. No. 77–10 at 4.* Plaintiff alleges that,
while he was incarcerated at the CCJ, the defendants
(1) deprived him of constitutionally adequate medical
care by removing him from a heart-healthy diet for
one month; (2) deprived him of his rights under the
First Amendment and RLUIPA to freely exercise his
Muslim religion by (a) repeatedly providing him with
meals that contained pork products, (b) denying him the
opportunity to participate in Ramadan, and (c) denying
him access to worship space and congregate religious
services; and (3) retaliated against him by denying him
adequate medical care and depriving him of his right to
freely exercise his religion in response to grievances and
complaints he filed against them during his incarceration
at the CCJ. [2] *See generally Dkt. No. 17.* Additionally,
plaintiff's amended complaint asserts a failure-to-protect
claim against defendants Clancy and Blaise, a corrections
sergeant and a corrections officer, respectively, at the CCJ.
*Id.*

[1]     In his amended complaint, plaintiff alleges that he
weighed 275 pounds upon his initial entry into the
CCJ, and 225 pounds upon his transfer into the
custody of the DOCCS. *Dkt. No. 17 at 11.* In a
memorandum submitted in opposition to defendants'
motions, however, plaintiff claims to have lost "about
175 lbs to 130 lbs" while confined in the CCJ due to
the deprivation of meals. *Dkt. No. 93–2 at 62.*

[2] A more precise description of the claims asserted against the defendants is included below in Part II. of this report.

### A. *Plaintiff's Diet*

**\*2** When he first arrived at the CCJ, Brandon reported that he was allergic to shellfish. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* A special diet notification form reflecting that food allergy was forwarded to the facility's kitchen. [3] *See Dkt. No. 17 at 47; Dkt. No. 75–1 at 37.* In March 2012, plaintiff reported that tomatoes and tomato by-products cause him to experience severe acid reflux. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* As a result, a notification was sent by medical personnel to the CCJ kitchen indicating "no tomato or tomato products per MD." *Dkt. No. 17 at 48; Dkt. No. 75–1 at 38.*

[3] The order was later reiterated on July 5, 2012. *Dkt. No. 17 at 50; Dkt. No. 75–1* at 40.

In May 2012, defendant Dr. Glen Schroyer, the jail physician at the CCJ, placed plaintiff on a heart-healthy diet due to his high cholesterol levels. *Dkt. No. 17 at 4–5,* 49; *Dkt. No. 75–1 at 39; Dkt. No. 75–6 at 2.* Plaintiff's heart-healthy diet restriction was later lifted on October 16, 2012, after a review of plaintiff's commissary purchases, which were being monitored by medical staff, revealed the purchase of many items that were inconsistent with plaintiff's dietary restrictions, including products that were high in fat and cholesterol. [4] *Dkt. No. 17 at 8–9, 52; Dkt. No. 75–1 at 41; Dkt. No. 75–6 at 3.* For example, the record reveals that, during the relevant period, plaintiff's commissary purchases included a wide array of candy, cookies, snacks, and sugared drinks. *Dkt. No. 75–1 at 60–62.* Plaintiff also purchased Ramen chili, which contains tomato powder, and is therefore inconsistent with his previously alleged sensitivity to tomatoes and tomato by-products. *Id.*

[4] In his affidavit, defendant Schroyer states that plaintiff was repeatedly counseled by medical staff concerning his non-compliance with his restrictive diets, and was warned, prior to October 16, 2012, that continued non-compliance would result in removal of the dietary restrictions. *Dkt. No. 75–6 at 3.* This assertion is sharply contested by plaintiff, who contends that the restrictions were lifted without warning. *Dkt. No. 83 at 3–4.* Plaintiff notes, moreover, that defendant Schroyer responded as follows to one of his interrogatories:

*Interrogatory No. 15:*
Did Dr. Schroyer or anyone else within the Medical–Staff notify Plaintiff that purchasing or consuming certain items from commissary would result in the removal (cancellation) of his dietary restriction at anytime [sic] on or before October 16, 2012?

*Answer to Interrogatory No. 15:*
The applicable medical records indicate that a discussion was held between the defendant and plaintiff on October 16, 2012 regarding plaintiff's non-compliance with his low fat/low cholesterol diet. The records further indicate that the proposed plan discussed in response to such noncompliance and plaintiff's assertion that he would, 'not be compliant with any diet' was the removal of such diet.

*Dkt. No. 83–3 at 25.* While this presents a disputed question of fact, as will be discussed below in Part III.B.1. of this report, it is not material to plaintiff's deliberate medical indifference claims against defendant Schroyer.

Plaintiff's heart-healthy diet was restored on or about November 21, 2012, after plaintiff promised not to purchase certain designated items from the commissary. *Dkt. No. 17 at 10,* 53, 188; *Dkt. No. 75–1 at 42.* Following that restoration, plaintiff's restrictive diet remained in place until his transfer out of the CCJ. *Dkt. No. 17 at 10.*

**\*3** In addition to raising concerns about health-related dietary restrictions implemented at the CCJ, as part of his religious accommodation claim, plaintiff alleges that defendants served him food that was inconsistent with his religion, as a Muslim. Plaintiff alleges that he informed prison officials at the CCJ upon his arrival on January 14, 2012, and again when he was rearrested on March 2, 2012, that, because of his Muslim religion, he cannot eat pork. *Dkt. No. 17 at 12–13; Dkt. No. 83 at 6.* According to plaintiff, despite prison officials' awareness of this restriction, he was served food containing pork on numerous occasions. *Dkt. No. 17 at 17–18,* 20–22. Plaintiff alleges that between the time of his entry into the CCJ through May 28, 2012, he was routinely served pork against his religious beliefs. *Dkt. No. 17 at 13,* 17. He further claims that on May 28, 2012, he filed a complaint with medical staff concerning the failure to receive a religious diet, and that in response, defendant Nurse Kinter stated that the kitchen was aware of his dietary restrictions. [5] *Id.* at 13.

5  Plaintiff's amended complaint makes reference, in this regard, to Exhibit E. *Dkt. No. 17 at 13.* Relevant portions of the referenced document, however, are illegible. *Id.* at 65. The document is reproduced at *Dkt. No. 83–3 at 2* and *Dkt. No. 93–4 at 68*, and again, half of the document cannot be deciphered.

On June 21, 2012, plaintiff submitted a sick-call request inquiring about a knee brace and complaining of being served pork. *Dkt. No. 17 at 13,* 66. The only response to that sick-call request was recorded as "given knee brace." *Id.* at 66. Plaintiff submitted an additional sick-call request raising concerns about his diet on July 4, 2012. *Id.* at 13, 67. In response, a nurse [6] wrote, "Done – for no fish/shell fish. Need to ask security staff to submit diet slip for *pork* medical does not do religious diets." *Id.* at 67 (emphasis in original).

6  Plaintiff alleges that defendant Kinter authored the response to this sick-call request. *Dkt. No. 17 at 14.* It is not clear, however, that this is accurate because in response to other sick-call requests, defendant Kinter would sign "SK." *See, e.g. id.* at 65. The sick-call response dated July 5, 2012 was signed, "S.F. RN." *Id.* at 67.

Plaintiff cites eight additional instances when he was served pork and raised complaints. The first and second occurred on September 24, 2012, during lunch and dinner. *Dkt. No. 93–4 at 82–82.* The next two instances occurred on October 9 and 10, 2012. *Id.* at 94–99. On October 17, 2012, plaintiff contends he was served pork, after which he filed a grievance and was provided a new meal. *Dkt. No. 17 at 18; Dkt. No. 93–4 at 116–17.* Plaintiff was again allegedly served pork on October 29, 2012, although a grievance filed regarding that incident purportedly "disappeared." *Dkt. No. 17 at 20.* Plaintiff was also allegedly served a meal containing pork on November 5, 2012, and although he claims to have lodged a grievance concerning that matter it is not included within his submissions. *Dkt. No. 17 at 21.* The last occurrence of allegedly being served pork was on December 25, 2012, and plaintiff again filed a grievance concerning the matter. *Dkt. No. 17 at 22; Dkt. No. 93–4 at 16465.*

The record evidence raises a number of questions regarding when the CCJ kitchen staff learned of plaintiff's religious dietary restrictions. According to defendant Laurin, when plaintiff first arrived at the CCJ on January 14, 2012, he did not declare any religious affiliation. *Dkt. No. 7714 at 2.* Although plaintiff disputes this, *Dkt. No.*

*17 at 12; Dkt. No. 83 at 6,* his initial booking intake record does not reflect any religious designation. [7] *Dkt. No. 77– 6 at 2.* There is no dispute, however, that when plaintiff was rebooked on March 2, 2012, he stated that he was a Muslim, and this was reflected on his booking sheet. [8] *Dkt. No. 17 at 210; Dkt. No. 83–3 at 36.*

7  The record is unclear as to how long plaintiff was confined in the CCJ after his initial intake on January 14, 2012. Plaintiff's amended complaint does not state whether he received any meals containing pork between that initial intake and his re-arrest in March and, if so, how many.

8  Plaintiff's booking sheet from his rearrest in March 2012 also includes a note that reads, "Cautionary: Muslim Diet." *Dkt. No. 17 at 210.*

**\*4** Defendant Laurin explained that "it is the practice of the CCJ that any religious diets to be issued to inmates are initiated by the Booking Officer after an inmate requests such accommodation and demonstrates that he has a sincerely held belief. Notifications of any religious diets have been forwarded to the kitchen." *Dkt. No. 77–14 at 2.* Defendant Laurin contends that, in light of plaintiff's declaration of his religion in March 2012, a notification was placed in his file indicating that he should be provided with a diet consistent with his religious beliefs. *Dkt. No. 77–14 at 3.* In support of that contention, defendant Laurin cites to a document in the record entitled "SPECIAL DIET NOTIFICATION," reflecting that plaintiff, as a Muslim, was not to receive pork or pork products. *Dkt. No. 77–3 at 7.* Notably, the copy of that notice that is included by defendant Laurin in support of his motion is not dated. *Id.* As an attachment to his amended complaint and in response to defendants' motion, however, plaintiff has submitted copies of the same notice, except his copies both include a date of "10/5/12," which is written in what appears to be defendant Laurin's handwriting. *Dkt. No. 17 at 51; Dkt. No. 83–3 at 42.* Plaintiff contends, and the court finds it plausible, that the version of this notice produced by defendants in support of their motion has been "falsified ... by removing the date written on the notification[.]" [9] *Dkt. No. 93–3 at 11.*

In any event, a careful review of the chronology, including plaintiff's grievances and responses to those grievances by CCJ staff, buttresses the conclusion that it was not until at least late-September 2012 that the CCJ kitchen staff

was notified of plaintiff's religious dietary restrictions. *See, e.g., Dkt. No. 77–5 at 21* (entry dated 9/27/12 authored by defendant Laurin stating, "[A]s of 9/27/12 the kitchen was reviewed [sic] of your diet ... and that you are Muslim"); *Dkt. No. 93–4 at 81* (entry dated 9/27/12 and authored by defendant Laurin stating that the "kitchen ... did not have that you were Muslim. You will get no pork or pork products"); *id.* at 94 (entry dated 10/10/12 and authored by Corrections Officer Couture stating, "I talked to Michelle in the kitchen and she told me that until recently they had nothing stating that Inmate Brandon was a no pork diet."); *id.* at 104 (entry dated 10/15/12 and authored by defendant Laurin stating, "Inmate Brandon was not marked in the kitchen as Muslim diet. That was corrected 10/5/12").

9  Defendants characterize plaintiff's accusation as "eccentric" and "evidence of his paranoia." *Dkt. No. 95–3 at 6.* While the court takes no position on these characterizations, it is worth noting that defendants do not dispute plaintiff's contention that the notice was altered. *Id.*

From the evidence in the record, two things are clear. First, until September 27, 2012, the CCJ kitchen staff was unaware of plaintiff's religious dietary restrictions, giving rise to the inference that, until that date, plaintiff was being served pork and pork products on occasion. Secondly, even after the kitchen learned of plaintiff's religious dietary restriction, plaintiff believes that he was served pork or pork products on six occasions, including (1) October 9, 2012; (2) October 10, 2012; (3) October 17, 2012; (4) October 29, 2012; (5) November 5, 2012; and (6) December 25, 2012. [10] *Dkt. No. 17 at 18,* 20, 21, 22; *Dkt. No. 93–4 at 9499,* 116–17, 164–65.

10  Defendants contest whether some of those meals included pork or pork products. *See, e.g., Dkt. No. 77–19 at 9.*

### B. *Other Religious Accommodation*

Plaintiff's complaint also alleges that he was denied a location to practice his religion and the opportunity to celebrate Ramadan between July 20, 2012 and August 19,

2012. *Dkt. No. 17 at 14–15,* 17. According to plaintiff, his requests to accommodate his observation of the holiday were denied by CCJ security because he was one of the only detainees requesting to honor the holiday and there were only a few Muslim detainees at the CCJ. *Id.* at 14. Plaintiff was further advised that, due to staffing and funding shortages, the CCJ was unable to cater to a specific religious group consisting of only a few participants. *Id.* Plaintiff further claims that his request for the opportunity to engage in congregational prayer, referred to as "Jummah," which is allegedly obligatory to all male Muslims, was denied by prison officials. *Id.* at 15. Plaintiff alleges that he filed grievances concerning these issues within the CCJ and additionally sought redress through outside sources. *Id.* at 15–16.

### C. *Assault by a Fellow Inmate*

**\*5** On or about November 17, 2012, plaintiff alleges that defendants Blaise and Clancy housed a mentally ill inmate, referred to by plaintiff as "Tiny," in the cell next door to him. *Dkt. No. 17 at 31.* Defendant Clancy apparently could be heard by plaintiff to say, " '[L]ets [sic] see if he tries that shit on Brandon!' " *Id.* According to plaintiff, two days later, defendant Blaise directed him to "exit [his] cell and collect all of the trays[.]" *Id.* Plaintiff, however, informed defendant Blaise that, the night before, Tiny had verbally assaulted plaintiff and that he "would rather not pick-up [Tiny]'s tray." *Id.* Defendant Blaise responded by saying to plaintiff, " '[D]on't worry about him, he's a punk. Besides, from what I heard, I'm sure if I let him out, you'd kick his ass.' " *Id.* Tiny thereafter became hostile towards plaintiff and spat on him while defendant Blaise observed. *Id.* Defendant Blaise responded by laughing at plaintiff. *Id.*

### II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about August 8, 2013, and later filed an amended complaint, the currently operative pleading, on August 15, 2014. Dkt. Nos. 1, 17. In his amended complaint, plaintiff names the following defendants:

| *Defendant* | *Position* |
| --- | --- |
| Dr. Glen Schroyer | CCJ Jail Doctor |
| Suzanne Kinter | CCJ Nurse |

| Lawrence Bedard | CCJ Food Service Manager |
| Jim Alger | CCJ Corrections Officer |
| Joshua Wingler | CCJ Corrections Officer |
| Thomas Perry | CCJ Corrections Officer |
| Robert Web | CCJ Corrections Officer |
| Eric Blaise | CCJ Corrections Officer |
| Margaret Clansy | CCJ Corrections Sergeant |
| Kevin Laurin | CCJ Corrections Lieutenant |

County of Clinton. [11]

[11] Defendants County of Clinton and Alger were dismissed from the action by District Judge Gary L. Sharpe in a decision and order dated August 15, 2015. *Dkt. No. 16.*

For purposes of this report, the following defendants will be collectively referred to as the "county defendants": (1) Suzanne Kinter, (2) Lawrence Bedard, (3) Joshua Wingler, (4) Thomas Perry, (5) Robert Web, (6) Eric Blaise, (7) Margaret Clancy, and (8) Kevin Laurin.

In his amended complaint, which spans forty-four pages comprised of 336 paragraphs, and is accompanied by approximately 177 pages of exhibits, plaintiff chronicles in detail the occurrences at the CCJ giving rise to his claims. The causes of action set forth in that pleading include deliberate medical indifference, failure to permit plaintiff to freely exercise his chosen religion, retaliation, conspiracy, and failure to protect plaintiff from harm. For the sake of clarity, I have included below a table that reflects the court's understanding of the claims asserted against each of the specific defendants.

| Defendant | Claims Asserted |
| --- | --- |
| Bedard | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Blaise | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Clancy | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |

| | |
|---|---|
| Kinter | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Laurin | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Perry | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Schroyer | (1) First Amendment regarding diet (direct theory of liability only); (2) Eighth Amendment (direct and conspiracy theories of liability); and (3) First Amendment retaliation (direct theory of liability only) |
| Web | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Wingler | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

On August 3, 2015, defendant Schroyer filed a motion for summary judgment dismissing plaintiff's complaint. *Dkt. No. 75.* On the same date, the county defendants submitted a separate summary judgment motion, also seeking dismissal of plaintiff's claims. *Dkt. No. 77.* The defendants' motions are now fully briefed, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also*

*Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Defendant Schroyer's Motion*

In his amended complaint, plaintiff claims that defendant Schroyer was deliberately indifferent to his serious medical needs by discontinuing his heart-healthy diet for a period of approximately one month, and that the discontinuation was in retaliation for plaintiff's many grievances concerning his diet at the facility. Plaintiff also alleges that defendant Schroyer conspired with others at the facility to violate his rights under the First and Eighth Amendments.

1. *Deliberate Medical Indifference*

Plaintiff's deliberate indifference claim is properly analyzed under the Eighth Amendment, which prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton

inflict of pain[.]" (*Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment through deliberate indifference to the inmate's serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer,* 511 U.S. at 844; *see also Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003).

**\*8** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by

'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.; see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Based upon the record now before the court, I conclude that plaintiff cannot meet either element of the governing deliberate indifference test. The only tangible effect of the month-long hiatus in plaintiff's heart-healthy diet was a modest increase in his cholesterol level from 249 to 264. *Dkt. No. 17 at 25–26,* 62, 63; *Dkt. No. 83 at 5.* According to defendant Schroyer, however, such a fluctuation is within normal limits "and does not place a patient at an increased risk for coronary artery disease, ischemia or stroke." *Dkt. No. 75–6 at 4.* The only "evidence" offered to counter defendant Schroyer's medical opinion is plaintiff's unsupported contention that he was placed at an indiscernible amount of risk for coronary heart disease, ischemia, and stroke as a result of the changed diet. *Dkt. No. 17 at 36; Dkt. No. 83 at 5.* While plaintiff's high cholesterol may constitute a serious medical need –an assertion not disputed by defendants – there is no evidence aside from plaintiff's sheer speculation that defendant Schroyer's decision to remove plaintiff from the heart-healthy diet for one month was objectively sufficiently serious for purposes of a deliberate medical indifference claim.

Moreover, plaintiff has also failed to adduce any evidence to give rise to a genuine dispute of material fact with respect to whether defendant Schroyer removed plaintiff from the heart-healthy diet with the requisite deliberate indifference. In his affidavit, defendant Schroyer states that plaintiff's heart-healthy diet was discontinued on October 16, 2012, because he repeatedly made commissary purchases that were inconsistent with his diet restrictions.

*Dkt. No. 75–6 at 4.* Although the parties dispute whether plaintiff was warned ahead of time that his commissary purchases could result in his removal from the diet, *compare Dkt. No. 17 at 27 with Dkt. No. 75–6 at 3,* there is no record evidence that suggests defendant Schroyer's decision on October 16, 2012 was reckless or executed with a disregard to plaintiff's health.

Plaintiff surmises that defendant Schroyer was complicit in a conspiracy to punish him for filing grievances. Specifically, plaintiff contends that, in retaliation for his filing of grievances up through October 15, 2012, regarding his meal trays, defendant Laurin rendered a medical assessment based on plaintiff's commissary purchases and thereafter instructed defendant Schroyer to remove plaintiff from his heart-healthy diet. *Dkt. No. 17 at 25–27.* Aside from plaintiff's sheer conjecture in this regard, however, he has submitted no evidence from which a reasonable factfinder could conclude that defendant Schroyer was aware of the existence of plaintiff's grievances and took action to discontinue plaintiff's heart-healthy diet for punitive reasons.

Because the record before the court, even when construed most favorably toward the plaintiff, fails to contain evidence from which a reasonable factfinder could conclude that plaintiff has met both the objective and subjective requirements for establishing a claim of deliberate medical indifference, I recommend that it be dismissed.

### 2. *Free Exercise*

**\*9** In addition to claiming deliberate medical indifference, plaintiff contends that defendant Schroyer is responsible for denying him an appropriate religious diet, and specifically, one that conformed to his Muslim faith and did not include pork or pork products. [12] Undeniably, plaintiff was entitled to receive a diet that was consistent with his sincerely held religious beliefs. *See, e.g., Johnson v. Guiffere,* No. 04–CV–0057, 2007 WL 3046703, at \*4 (N.D.N.Y. Oct. 17, 2007) (Hurd, J., *adopting report and recommendation by* Peebles, M.J.). [13] The record, however, demonstrates that at the CCJ, accommodating diet restrictions in accordance with an inmate's religious beliefs is the responsibility of security staff, rather than medical personnel. *See, e.g., Dkt. No. 75–6 at 2; see also Dkt. No. 75–1 at 44,* 50. To counter this, and in an

attempt to implicate defendant Schroyer, plaintiff offers only his speculation based upon the fact that, at one point, in response to a sick-call complaint by plaintiff that he was being served pork, defendant Kinter, a nurse at the facility, informed him that his religious diet was still in effect and that she had checked with the kitchen regarding the matter. *Dkt. No. 83 at 3; Dkt. No. 83–3 at 11.* Because this assertion does not contradict defendant Schroyer's contention that medical staff is not responsible for accommodating prisoners' religious dietary needs, it does not suffice to raise a genuine issue of material fact that precludes the entry of summary judgment. In short, I find that no reasonable factfinder could conclude that defendant Schroyer was involved in any violation of plaintiff's religious rights through the failure to provide him a diet consistent with his religious beliefs. I therefore recommend that plaintiff's First Amendment free exercise claim asserted against defendant Schroyer be dismissed.

12    Even liberally construed, plaintiff's amended complaint does not assert a First Amendment free exercise cause of action against defendant Schroyer with respect to plaintiff's allegations that he was denied the opportunity to participate in Ramadan and/or congregational services. For that reason, I have not analyzed that claim in the context of defendant Schroyer's motion.

13    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### 3. *Retaliation*

In his motion, defendant Schroyer does not address the retaliation cause of action asserted against him. Accordingly, while I have not addressed that claim in this report, and therefore recommend it survive defendant's motion, I also recommend that defendant Schroyer be permitted to file a second motion for summary judgment addressing it.

### 4. *Conspiracy*

Plaintiff's amended complaint includes a conspiracy claim against defendant Schroyer in connection with his deliberate medical indifference cause of action. In light of my recommended finding that the underlying constitutional claim lacks merit and should be dismissed, however, I also recommend that the accompanying conspiracy claim be dismissed. *See Droz v. McFadden, 580 F.3d 106, 109 (2d Cir. 2009)* ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.").

### C. *County Defendants' Motion*

#### 1. *RLUIPA* [14]

14    While plaintiff's amended complaint mentions in passing the RLUIPA, it does not expressly state a claim under that provision. *See, e.g., Dkt. No. 17 at 16,* 36–42. Nonetheless, mindful that the court is required to construe a *pro se* litigant's pleadings to raise the strongest arguments suggested, *Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013),* I have considered plaintiff's amended complaint to assert a cause of action under that provision, as well.

To the extent plaintiff intended to assert RLUIPA claims against any of the county defendants in both their official and individual capacities, they are subject to dismissal. As relief, plaintiff's complaint seeks both money damages and declaratory relief. *Dkt. No. 17 at 42–44.* It is now firmly established, however, that the "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord, 758 F.3d 215, 224 (2d Cir. 2014).* While plaintiff ordinarily could pursue a claim for injunctive and declaratory relief under the RLUIPA against defendants in their official capacities, *Williams v. Fisher,* No. 11–CV–0379, 2015 WL 1137644, at *17 (N.D.N.Y. Mar. 11, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.), such claims are now moot based upon plaintiff's transfer out of the CCJ. *See Shepherd v. Goord, 662 F.3d 603, 610 (2d Cir. 2011)* ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."). Accordingly, I recommend that plaintiff's RLUIPA claim asserted against the county defendants be dismissed.

#### 2. *Conspiracy*

**\*10** Plaintiff alleges that there was a "meeting of the minds" among some of the defendants to deprive him of his civil rights. *See, e.g., Dkt. No. 17 at 25,* 27–29. Specifically, he contends that defendant Laurin evaluated plaintiff's commissary purchases on or about October 15, 2012, and decided that plaintiff's purchases were inconsistent with his heart-healthy diet. *See Dkt. No. 17 at 24* ("Said conspiracy was initiated on October 15, 2012, as Laurin made a medical assessment stating my commissary buys is a form of non-compliance to my special diet."). Defendant Laurin thereafter allegedly communicated his "assessment" to defendants Schroyer and Kinter and the three arrived at an agreement to remove plaintiff from the heart-healthy diet. *See id.* at 25 ("Kinter concurred [with] said assessment [and] Schroyer rubber-stamped it into effect.... Thus, on October 16th, 2012, said conspiracy went into effect; Kinter informed me of the removal of all previously listed diets, stating I'm not complying to said diets based on my commissary purchases."). Plaintiff also specifically implicates defendant Bedard in his conspiracy claim, accusing him of "enforc[ing]" the decision by defendants Schroyer and Kinter to remove him from his special diets and intentionally accelerating the conspiracy by mislabeling his food thereafter to reflect that his meals did not contain pork. *Id.* at 25, 27. To further defendant Bedard's alleged "viciousness," he "established a meeting of the minds with Clansy and Web." *Id.* at 27. According to plaintiff, defendant Clancy furthered the conspiracy by admitting to plaintiff that the CCJ kitchen made a mistake on October 17, 2012, by serving plaintiff a meal containing pork products. *Id.* at 28. On November 5, 2012, defendant Web allegedly fielded a concern by plaintiff that his food contained pork by reaching out to the CCJ kitchen, who told Web that the meat was actually turkey. *Id.* at 29. Plaintiff contends that defendant Web's refusal to disclose who he spoke to in the kitchen perpetuated the conspiracy initiated by defendants Laurin, Kinter, and Schroyer.[15] *Id.*

[15]   To be clear, then, in light of all of the allegations described above, I have construed plaintiff's amended complaint as asserting (1) a deliberate medical indifference claim against defendants Schroyer, Laurin, Kinter, and Bedard based on a conspiracy theory of liability; and (2) free exercise and RLUIPA claims regarding plaintiff's religious dietary restrictions against defendants Bedard, Clancy, and Web based on a conspiracy theory of liability. In addition, although plaintiff contends that defendants

Clancy and Blaise conspired to violate his rights with respect to the incident involving another inmate on or about November 17, 2012, *see, e.g, Dkt. No. 17 at 31,* I have construed and analyzed those allegations as giving rise to an Eighth Amendment failure-to-protect cause of action, which I will address more completely below in Part III.C.5.c. of this report.

"To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights are not sufficient to support a cognizable claim under section 1983. *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983); *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1156 (2d Cir. 1995).

In this case, although plaintiff's allegations regarding the extent of the conspiracy are detailed, there is no evidence in the record to support them. While defendant Kinter confirms that she discussed the decision to remove plaintiff from his heart-healthy diet with defendants Laurin and Schroyer prior to October 16, 2012, there is no record evidence to suggest that the decision was motivated by plaintiff's previously filed grievances or any other reason aside from plaintiff's commissary purchases. *Dkt. No. 7710 at 3–4.* According to defendant Kinter, plaintiff's commissary purchases were monitored by medical staff from July 25, 2012 until September 30, 2012, because "[p]laintiff showed little medical improvement after [his] dietary restrictions had been implemented." *Id.* at 3. A review of plaintiff's commissary purchases, submitted by way of commissary receipts in support of the county defendants' motion, supports defendants' assertion that plaintiff was purchasing foods that were inconsistent with a low-fat, low-cholesterol diet during the relevant time period. *Dkt. No. 77–4 at 2–5.* Plaintiff's bare allegation with respect to the alleged "meeting of the minds" in this respect is not sufficient to defeat the county defendants' motion.

Similarly, plaintiff's allegations in his amended complaint are insufficient to give rise to a genuine dispute of material fact regarding whether defendant Bedard furthered any conspiracy by mislabeling his food. Aside from plaintiff's own allegation, there is no evidence that defendant Bedard

did, in fact, mislabel any of plaintiff's meals. In addition, there is no evidence in the record to suggest that defendant Bedard acted maliciously in preparing plaintiff's meals, and he states that the CCJ kitchen staff prepared plaintiff's food "in accordance with the records and notifications [they] had on file for him." *Dkt. No. 77–11 at 4.* Defendant Bedard also explained that, "[t]o the extent the Plaintiff grieved of being served pork he would either be provided a replacement meal, or as was most often the case, be instructed that the food being served was not pork at all, but rather a different type of food such as turkey." *Id.*

**\*11** With respect to plaintiff's allegations that defendant Clancy conspired with defendant Bedard to maliciously mislabel plaintiff's food, again, aside from plaintiff's own contentions in his amended complaint, there is no evidence in the record to support this claim. While plaintiff contends that "a meeting of the minds was established when [defendant Clancy] admitted to speaking to the Kitchen staff" on October 18, 2012, regarding plaintiff having received a meal containing pork in it the day prior, there is no evidence regarding the identity of the person with whom she spoke. *Dkt. No. 17 at 28.* Any contention by plaintiff that defendant Clancy spoke to defendant Bedard or that the two agreed to violate plaintiff's rights at that time is pure conjecture. In any event, plaintiff alleges that defendant Clancy explained to him that he received the meal from the day prior by mistake due to a new CCJ staff employee's error. *Id.* at 19. Contrary to plaintiff's allegations of a large-scale conspiracy to violate plaintiff's rights, defendant Clancy immediately provided him with a new meal. *Dkt. No. 775 at 26.*

There is also no evidence that defendants Bedard and Web conspired. While plaintiff speculates in his amended complaint that "[a] meeting of the minds was established by Web and Bedard" regarding a meal plaintiff was provided on November 5, 2012, there is no other evidence to suggest that those two individuals ever spoke. *Dkt. No. 17 at 29.* According to plaintiff's own allegations, in response to his complaint that his meal on that date contained pork, defendant Web contacted the CCJ kitchen and then informed plaintiff the meat product was turkey, not pork. *Id.* at 21–22. There is no record of the identity of the person with whom defendant Web spoke, rendering plaintiff's allegation that it was defendant Bedard (and the allegation that the two agreed to violate plaintiff's rights) mere speculation.

For all of the reasons discussed above, I find no evidence from which a reasonable factfinder could conclude that defendants Laurin, Kinter, Bedard, Web, and Clancy conspired to violate plaintiff's constitutional rights.

In addition, plaintiff's conspiracy claim appears to be precluded by the intra-agency, or intra-corporate, conspiracy doctrine, which provides "the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." [16] *Little v. City of N.Y.,* 487 F.Supp.2d 426, 441–42 (S.D.N.Y. 2007). Because defendants Laurin, Kinter, Bedard, Clancy, and Web are all employees of the County of Clinton, and plaintiff's own allegations suggest that each of them was acting within the scope of his or her employment at the relevant times, plaintiff's conspiracy claims are precluded by virtue of the intra-corporate conspiracy doctrine.

[16]     The doctrine is rooted in the Sherman Antitrust Act, 15 U.S.C. § 1, and, although it was developed in the context of business entities, since its inception has been expanded to apply to business corporations and public entities, as well. *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y. 2002)

Although plaintiff's amended complaint mentions, in passing, 42 U.S.C. § 1985, there is no record evidence to support a conspiracy claim against the defendants under section 1985(3). To sustain a cause of action for conspiracy to violate civil rights under that provision, a plaintiff must demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunity secured by law. *United Bhd. of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 835 (1983); *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994). "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." *Gagliardi,* 18 F.3d at 193. A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be demonstrated through circumstantial evidence that "shows the parties have a tacit understanding to carry out the prohibited conduct." *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir. 1995) (quotation marks omitted).

**\*12** In this case, there is no record evidence, including any allegations in plaintiff's amended complaint, regarding race-based animus or that plaintiff's membership in a suspect class provided motivation for the defendants' conduct. Indeed, the plaintiff's theory appears to be that it was his filing of grievances, and not his race, that motivated the defendants to take adverse action against him. Accordingly, I recommend plaintiff's section 1985(3) cause of action be dismissed on the merits.

### 3. *Free Exercise (Regarding Plaintiff's Ramadan and Congregational Prayer Allegations) and Retaliation*

Citing plaintiff's alleged failure to exhaust the available administrative remedies prior to filing this lawsuit, defendants seek dismissal of plaintiff's (1) free exercise claims to the extent they are based on allegations that plaintiff was deprived of the opportunity to participate in (a) Ramadan during July and August 2012, and (b) congregational Jummah services; and (2) retaliation claims.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV– 0471, 2006 WL 2639369, at \*1 (N.D.N.Y.

Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007). [17]

| | |
|---|---|
| 17 | While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir. 2004) (emphasis omitted)). |

As an inmate at the CCJ, plaintiff had available to him a grievance process for use in complaining of prison conditions. *Dkt. No. 77–14 at 3.* In accordance with the prescribed grievance procedure, an inmate complaining of prison conditions must first request a grievance form from one of the corrections officers on duty. *Id.* At that point the corrections officer must make an attempt to resolve the grievance informally. *Id.* If those efforts are unsuccessful, a formal grievance must be filed, and the matter is then investigated by defendant Laurin, as the inmate grievance coordinator, who, following his investigation, makes a decision concerning the matter. *Id.* In the event the inmate is dissatisfied with defendant Laurin's decision, he may appeal it to the Citizens Policy and Complaint Review Council ("CPCRC"). *Id.* If a plaintiff fails to follow each of the required steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

**\*13** The record reflects that plaintiff availed himself of the grievance process on several occasions during the course of his incarceration at the CCJ. [18] *Dkt. No. 17 at 78–161; Dkt. No. 77–5 at 2–47; Dkt. No. 93–4 at 76170.* None of those grievances, however, appear to relate to the alleged failure of prison officials to permit him to observe Ramadan, to engage in congregate prayer, or retaliation

by any defendants. *Id.* In his response to the county defendants' motion, plaintiff argues that, with "respect to Ramadhan and Congregational Prayer, not only did Plaintiff grieve these deprivaties [sic] but for exhaustion purposes, he went to the extent of appealing to the direct attention of CPCRC – just as he did all of his other claims." *Dkt. No. 93–2 at 40.* The grievances to which plaintiff cites in support of this contention, however, do not relate to being deprived access to religious services, the right to participate in Ramadan, or retaliation. *Dkt. No. 93–4 at 167–171.* Thus, it appears that plaintiff has failed to exhaust the available administrative remedies with respect to these causes of action.

18    Plaintiff contends that some of his grievances were intentionally lost or destroyed by CCJ staff. *See, e.g., Dkt. No. 17 at 20.*

Plaintiff's failure to exhaust, however, does not warrant dismissal of the amended complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. N.Y., 380 F.3d 680, 686 (2d Cir. 2004); see also Macias, 495 F.3d at 41.* Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686.* In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

Plaintiff contends that he should be excused from the exhaustion requirement because, on the morning that Ramadan began in July 2012, the "Shift Officer" threatened plaintiff with physical violence. *Dkt. No. 93–2 at 40.* There is no evidence in the record, aside from plaintiff's allegations, however, that this threat actually occurred or that the assault of another Muslim inmate from the previous day, to which the Shift Officer referred in threatening plaintiff, actually occurred. In any event, according to plaintiff's own amended complaint, on a different occasion, when he was allegedly threatened by defendant Clancy on or about October 18, 2012 about filing a grievance concerning a meal, he, in fact, complained to defendant Laurin "about Clansy's [sic] threat." *Dkt. No. 17 at 19.* This demonstrates that plaintiff had a history of ignoring threats by some corrections officers and suggests he did not find the threats of CCJ security staff necessarily compelling. Most persuasive to me in recommending that the court find that there are no circumstances that exist to excuse plaintiff's failure to exhaust, however, is that courts in this circuit have concluded that the type of vague threat, allegedly directed toward plaintiff by an unidentified individual, cannot serve as a basis for finding an inmate excused from the PLRA exhaustion requirement. *See Singh v. Lynch, 460 Fed.Appx. 45, 4748 (2d Cir. 2012)* ("The test for determining the availability of grievance procedures to a prisoner is objective.... Singh's subjective fear of retaliatory physical harm derives from two facts: the unreported June 6, 2005 assault and other inmates' warnings that Lynch was out to get him. The former fact cannot, by itself, support an objective finding that grievance procedures were unavailable.... As for the alleged inmate warnings, in the absence of any particulars indicating that Lynch was looking to do more than harass Singh ..., this fact cannot support a finding that grievance procedures for an assault claim were effectively unavailable."); *Harrison v. Stallone, No. 06–CV–0902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007)* (Kahn, J., *adopting report and recommendation by* DiBianco, M.J.) (concluding that the plaintiff was not excused from exhausting available administrative remedies even where the plaintiff alleged in his complaint that he did not file a grievance because he was " 'afraid of retaliation' " and he stated in opposition to the defendants' motion for summary judgment that "he had a 'legitimate fear' of retaliation because his substantive claim is one for retaliation"). To hold otherwise would permit an exception that would be easily and often incanted by inmates, and would potentially eviscerate the PLRA's exhaustion rule. *Harrison, 2007 WL 2789473, at *6.*

4. *Personal Involvement*

**\*14** Defendants seek dismissal of the claims asserted against defendants Bedard, Blaise, Clancy, Perry, Web, and Wingler, arguing that there is no evidence in the record from which a reasonable factfinder could conclude that any of those individuals were personally involved in the alleged unconstitutional conduct.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,* No. 91–CV–8135, 1994 WL 23069, at \*3 (S.D.N.Y. Jan. 24, 1994).

In the event the recommendations above are adopted, the remaining claims for consideration against the county defendants in this regard are plaintiff's deliberate medical indifference claim and his free exercise claim regarding his dietary restrictions. At the outset of my analysis, it is worth noting that the thrust of defendants' arguments with respect to whether the defendants considered below were personally involved is aimed at whether they are in fact *responsible* for the conduct alleged by plaintiff. *See, e.g., Dkt. No. 77–19 at 24* ("Although these Defendants had interactions with the Plaintiff, they did not have any authority to alter Plaintiff's medical/dietary restrictions. They simply attempted to ensure that Plaintiff was provided a proper meal and provided him with a replacement meal if need be."). Because a personal involvement inquiry on summary judgment examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct, I have limited my analysis to that particular question in this part of the report.

#### a. *Defendant Bedard*

Plaintiff contends that defendant Bedard violated his rights by (1) enforcing the decision by defendants Schroyer and Kinter to remove him from his heart-healthy diet in October 2012, and (2) serving him meals that contained pork. Defendant Bedard's own affidavit discloses that he was personally involved by admitting that he discussed the status of plaintiff's meal restrictions with some of the other named defendants. *Dkt. No. 77–11 at 4.* In addition, defendant Bedard stated that, "[w]hen asked, [he] would discuss the components or ingredients of meals with the [corrections officers], and how this related to any restrictions the kitchen has on file for various inmates, in attempts to resolve any issues regarding an inmate being served a non-compliant meal." *Id.* In light of these statements, and considered in conjunction with plaintiff's allegations that CCJ corrections officers phoned the CCJ kitchen following his complaints about his food containing pork (and some of the grievances reflecting the same), I find that reasonable factfinder could conclude that defendant Bedard was personally involved in the alleged conduct giving rise to plaintiff's deliberate medical indifference cause of action and free exercise claim regarding his religious dietary restrictions.

#### b. *Defendant Blaise*

**\*15** There is no record evidence that defendant Blaise was involved in either plaintiff's medical indifference or free exercise claim. Indeed, there are no allegations in the amended complaint, nor has plaintiff subsequently alleged, that defendant Blaise was involved in providing or denying him meals at any time.[19] Plaintiff has acknowledged this in his response to the county defendants' motion. *See Dkt. No. 93–2 at 54* ("For the purpose of clarity, nowhere within the Amended Complaint is it alleged that Blaise deprived Plaintiff of meals or any of his various diets."). Accordingly, I recommend that plaintiff's medical indifference claim and free exercise claim regarding his religious diet be dismissed.

[19]    Instead, plaintiff has maintained that defendant Blaise is responsible for housing a mentally ill inmate next door to plaintiff's cell and asking plaintiff to retrieve the inmate's meal tray knowing that plaintiff

may be assaulted by the inmate. *Dkt. No. 17 at 31–32; see also Dkt. No. 93–2 at 54–56.* Those allegations will be addressed in Part III.C.5.c. of this report.

### c. *Defendant Clancy*

Turning first to plaintiff's deliberate medical indifference cause of action, there is no record evidence from which a reasonable factfinder could conclude that defendant Clancy was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Clancy.

Plaintiff alleges, however, and there is evidence in the record confirming that defendant Clancy responded to at least one of plaintiff's complaints regarding whether his meal contained pork. *Dkt. No. 17 at 1819; Dkt. No. 93–4 at 116–17.* As a CCJ Corrections Sergeant, defendant Clancy is considered a supervisory official, and, in that capacity, she may be found personally liable for a constitutional violation in the event she learned of a constitutional violation through a report or appeal and failed to remedy the wrong. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright,* 21 F.3d at 501. Because there is evidence in the record that reflects defendant Clancy learned that plaintiff received a meal that did not comport with his religious dietary restrictions, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Clancy on the basis of personal involvement.

### d. *Defendant Perry*

Turning first to plaintiff's deliberate medical indifference cause of action against this defendant, there is no record evidence from which a reasonable factfinder could conclude that defendant Perry was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Perry.

As to plaintiff's free exercise claim, plaintiff contends that, on December 25, 2012, defendant Perry responded to his complaint that his meal consisted of "pork rib-eye." *Dkt. No. 17 at 22–23.* Plaintiff requested a grievance form from defendant Perry, and the copy of the completed form that is in the record confirms that defendant Perry responded to plaintiff's request for a new meal. *Dkt. No. 93–4 at 164.* Thus, the record establishes that defendant Perry was involved in the alleged violation of plaintiff's free exercise rights on at least one occasion. For this reason, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Perry on the basis of personal involvement.

### e. *Defendant Web*

**\*16** Like defendants Blaise, Clancy, and Perry, there is no record evidence from which a reasonable factfinder could conclude that defendant Web was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Web.

Turning to plaintiff's free exercise claim, the amended complaint alleges that, on November 5, 2012, plaintiff complained to defendant Web that his meal contained pepperoni. *Dkt. No. 17 at 21.* In response, defendant Web allegedly told plaintiff that the meat was turkey ham, not pork, and thereafter called the CCJ kitchen to confirm that the meat was not pork. *Id.* at 21–22. Although plaintiff alleges that he filed a grievance regarding this incident, there is no copy of the grievance in the record before the court. *Id.* at 22; *Dkt. No. 93–4 at 76–171.* In his affidavit submitted in support of the county defendants' motion, defendant Web admits to "recall[ing] an occurrence of which the Plaintiff was complaining that he was served pork in contradiction to his religious diet. However the food he claimed was pork was actually turkey." *Dkt. No. 77–16 at 2.* In light of this additional record evidence supporting plaintiff's version of the events on November 5, 2012 as alleged in his amended complaint, I find there is a dispute of material fact as to whether defendant Web was personally involved in depriving plaintiff of a meal consistent with his religious diet on that date.

### f. *Defendant Wingler*

Plaintiff's claims against defendant Wingler stem from allegations that, on two occasions, defendant Wingler ignored plaintiff's complaints that his meals contained tomatoes in violation of his medical dietary restrictions. *Dkt. No. 17 at 7; Dkt. No. 93–2 at 58.* The record evidence includes two grievances, one dated October 3, 2012 and the second October 28, 2012, that confirm, at least, that (1) plaintiff complained of being served tomato products on those dates and (2) defendant Wingler addressed those complaints. *Dkt. No. 93–4 at 92,* 139. Therefore, I find there is sufficient evidence from which a reasonable factfinder could conclude that defendant Wingler was personally involved plaintiff's allegations that he was deprived of medically compliant meals.

With respect to plaintiff's free exercise claim asserted against defendant Wingler, however, there are no allegations in the amended complaint, and plaintiff has failed to subsequently submit any proof, reflecting that defendant Wingler was ever involved in providing or depriving plaintiff of any meals that were not in accordance with his religion. For that reason, I recommend plaintiff's free exercise claim in this regard against defendant Wingler be dismissed.

### 5. *Remaining Claims/Defendants*

#### a. *Plaintiff's Deliberate Medical Indifference Claim Asserted Against Defendants Laurin, Kinter, Bedard, and Wingler*

As discussed above in Part III.B. of this report with respect to defendant Schroyer, I find that there is no record evidence from which a reasonable factfinder could conclude that the alleged conduct of defendants Laurin, Kinter, Bedard, and Wingler was sufficiently serious to satisfy the objective element of a deliberate medical indifference cause of action. In particular, there is no record evidence, aside from plaintiff's allegation that he suffered an indiscernible amount of risk for a heart attack and stroke, that removing him from his heart-healthy diet for one month is constitutionally significant. *See, e.g., Cleveland v. Eagleton,* No. 14–CV–2444, 2015 WL 8919463, at *5 (D.S.C. Nov. 12, 2015) (finding that removing the plaintiff from his cholesterol medicine and his heart-healthy diet does not satisfy the objective element of a medical indifference claim). Because plaintiff cannot establish one of the required elements of the claim,

I recommend that his deliberate medical indifference cause of action be dismissed as to defendants Laurin, Kinter, Bedard, and Wingler.

#### b. *Plaintiff's Free Exercise Claim ( Regarding his Religious Dietary Restrictions) Asserted Against Defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web*

**\*17** While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to "a diet consistent with [their] religious scruples." *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir. 1992); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348–49 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990).

As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." [20] *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275. "[T]he burden [, however,] remains with the prisoner to 'show that these penological concerns

were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

20    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith,* 494 U.S. 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford v. McGinnis,* 352 F.3d 582, 592 (2d Cir. 2003) (quoting *Emp't Div.,* 494 U.S. at 887); *see also Holland v. Goord,* 758 F.3d 215, 220–21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

In this case, there is evidence in the record to support a factfinder's conclusion that plaintiff was initially served a meal that contained pork, which is inconsistent with his religious beliefs, on only ten occasions between March 28, 2012 and December 25, 2012. Specifically, a review of the record evidence, including the allegations in plaintiff's amended complaint, reveal that plaintiff was initially served meals containing pork on (1) June 21, 2012; (2) July 4, 2012; (3) September 24, 2012 at lunch; (4) September 24, 2012 at dinner; (5) October 9, 2012; (6) October 10, 2012; (7) October 17, 2012; (8) October 29, 2012; (9) November 5, 2012; and (10) December 25, 2012. *Dkt. No. 17 at 13,* 18, 20, 21, 22, 66, 67; *Dkt. No. 93–4 at 82–85,* 94–99, 116–17, 164–65. On September 24, 2012, plaintiff learned that the meat in his meals was vegetarian bacon. *Id.* at 83, 85. Similarly on October 10, 2012, plaintiff was told that the meat was turkey ham, not pork. *Id.* at 99. Nevertheless, there is evidence suggesting that on October 10, 2012 and December 25, 2012, his meal was replaced. *Id.* at 96, 164. While there is a dispute in the record regarding precisely when the CCJ learned of plaintiff's religious dietary restrictions, it is clear from the record that plaintiff may have been served pork only on ten dates during his one-year incarceration at the CCJ. This is not constitutionally significant and does not give rise to a dispute of fact regarding whether his First Amendment rights were substantially burdened. *See Norwood v. Strada,* 249 Fed.Appx. 269, 272 (3d Cir. 2007) (finding that the denial of seven consecutive religious

meals did not substantially burden the plaintiff's free exercise rights); *Washington v. Afify,* 968 F.Supp.2d 532, 538 (W.D.N.Y. 2013) ("Courts have generally held that incidents that are isolated, or few in number, involving religiously-mandated food, do not give rise to a First Amendment claim." (citing cases)); *Evans v. Albany Cnty. Corr. Facility,* No. 05–CV–1400, 2009 WL 1401645, at *8 (N.Y.N.D. May 14, 2009) (Suddaby, J.) (finding the plaintiff's allegations that he was served eighteen "wrong meals" out of an approximate 354 meals was constitutionally de minimis); *Odom v. Dixion,* No. 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (finding the plaintiff's allegation that the defendants failed to provide him with kosher meals on five of the fifteen days he was in keeplock confinement did not give rise to a cognizable constitutional violation). Accordingly, I recommend this claim be dismissed as to defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web.

### c. *Plaintiff's Failure–to–Protect Claim Asserted Against Defendants Blaise and Clancy*

**\*18** The county defendants do not seek dismissal of this claim in their summary judgment papers. For that reason, I recommend that the claim survive this motion but that defendants Blaise and Clancy be permitted an opportunity to file a second motion for summary judgment specific to this remaining claim.

### IV. *SUMMARY AND RECOMMENDATION*

A careful review of the evidence currently before the court demonstrates that no reasonable factfinder could conclude that any of the defendants were deliberately indifferent to plaintiff's medical needs, based upon a decision to remove him from his heart-healthy diet for a period of one month. Addressing plaintiff's religious claims, his assertion that his religious rights were violated when prison officials failed to permit him to celebrate Ramadan and to engage in congregational prayer are precluded based upon his failure to exhaust available administrative remedies before filing this action. Similarly, his retaliation claims are also not properly exhausted. Plaintiff's free exercise claim regarding his religious diet is also subject to dismissal in light of the absence of any evidence from which a reasonable factfinder could conclude that his rights were substantially burdened. Because defendant Schroyer did not seek dismissal of the plaintiff's retaliation claim, I recommend

that cause of action survive defendant Schroyer's motion but he be permitted to file a second motion for summary judgment addressing it. Similarly, the county defendants did not address plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and, accordingly, I recommend that claim survive but that those individuals be permitted to file a motion for summary judgment regarding that single claim.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant Schroyer's motion for summary judgment (*Dkt. No. 75*) be GRANTED to the extent it seeks dismissal of plaintiff's claims against him, with the exception of plaintiff's retaliation claim and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that the motion for summary judgment submitted by defendants Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web, and Wingler (*Dkt. No. 77*) be GRANTED to the extent it seeks dismissal of plaintiff's claims asserted against all defendants, with the exception of plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that defendant Schroyer be permitted to file a second motion for summary judgment addressing the retaliation claim not addressed in his first motion, and that defendants Blaise and Clancy be permitted to file a second motion for summary judgment addressing the failure-to-protect claim not addressed in their first motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Slip Copy, 2016 WL 1638242

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)

1994 WL 23069

1994 WL 23069
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dale HENDRICKSON, Plaintiff,

v.

UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
|
Jan. 24, 1994.

MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an inmate
then in confinement at the Federal Correctional
Institution in Otisville, New York ("Otisville"), filed this
action for injunctive relief and damages based upon
alleged violations of his rights under the United States
Constitution, Amendments I, IV, V, VI, IX, and XIII,
and upon violations of various laws and/or regulations
governing prison administration.[1] The Complaint named
as defendants G.L. Hershberger ("Hershberger"), the
United States Attorney General ("Attorney General"),
Gary Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith ("Keith"), the
Bureau of Prisons ("BOP"), and the Otisville Medical
Department ("OTV Medical Department") (collectively
"Defendants"). Defendants moved for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, or, in the alternative, for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set out below, Defendants'
Rule 12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Complaint,
pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for failure to state a claim upon which relief
can be granted. Rule 12(c) provides:

> After the pleadings are closed but
> within such time as not to delay
> the trial, any party may move
> for judgment on the pleadings.
> If, on a motion for judgment on
> the pleadings, matters outside the
> pleadings are presented to and
> not excluded by the court, the
> motion shall be treated as one for
> summary judgment and disposed
> of as provided in Rule 56, and all
> parties shall be given reasonable
> opportunity to present all material
> made pertinent to such a motion by
> Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that are
employed for dismissing a complaint for failure to state
a claim under Fed.R.Civ.P. 12(b)(6) are applicable" to a
Rule 12(c) motion to dismiss for failure to state a claim
upon which relief can be granted. See Ad–Hoc Comm.
of the Baruch Black & Hispanic Alumni Ass'n v. Bernard
M. Baruch College, 835 F.2d 980, 982 (2d Cir.1987); see
also Viacom Int'l. Inc. v. Time, Inc., 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Arthur R.
Miller, Federal Practice and Procedure ¶ 1367, at 515–
16 (1990). Thus, the Court must read the Complaint
generously, drawing all reasonable inferences from the
complainant's allegations. See California Motor Transp. v.
Trucking Unlimited, 404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations in
[the] amended complaint, which are accepted as true, to
documents attached to the complaint as an exhibit or
incorporated in it by reference, to matters of which judicial
notice may be taken, or to documents either in plaintiff['s]
possession or of which plaintiff[ ] had knowledge and
relied on in bringing suit." Brass v. American Film
Technologies, Inc., 987 F.2d 142 (2d Cir.1993); accord
Allen v. Westpoint–Pepperell, Inc., 945 F.2d 40, 44 (2d
Cir.1991); Cortec Indus., Inc. v. Sum Holding L.P., 949
F.2d 42, 47–48 (2d Cir.1991), cert. denied, 112 S.Ct.
1561 (1992); Frazier v. General Elec. Co., 930 F.2d 1004,
1007 (2d Cir.1991). Defendants, therefore, are entitled to
dismissal for failure to state a claim only if the Court finds
beyond a doubt that "plaintiff can prove no set of facts"
to support the claim that plaintiff is entitled to relief. See
Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)

1994 WL 23069

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

## II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

## III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)

1994 WL 23069

Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not

undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

### Summary and Order

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

1    The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

2    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

### All Citations

Not Reported in F.Supp., 1994 WL 23069

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1639904
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chamma K. Brandon, Plaintiff,

v.

Dr. Glen Schroyer, et al., Defendants.

9:13-CV-939 (TJM/DEP)
|
Signed 04/25/2016

### DECISION & ORDER

Thomas J. McAvoy, United States District Judge

**\*1** This action, brought pursuant to 42 U.S.C. §§ 1983, 1985 and 19 86, as well as the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, alleges that Defendants violated the Plaintiff's rights by denying him access to food appropriate to his religion and preventing him participating in religious ceremonies during his incarceration, and by failing to protect him from an assault by a fellow inmate. The action was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation, dated February 26, 2016, recommends that Defendants' motions for summary judgment be granted in part and denied in part, and that Defendant Glen Schroyer be permitted to file a supplemental motion for summary judgment to address Plaintiff's claims of retaliation. See dkt. # 99. Defendant Schroyer subsequently filed such a motion. See dkt. # 100.

Plaintiff filed objections to the Report-Recommendation. When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which

objection is made." See 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Peebles for the reasons stated in the Report-Recommendation.

It is therefore

**ORDERED** that the Plaintiff's objections to the Report-Recommendation of Magistrate Judge Peebles, dkt. # 111, are hereby OVERRULED. The Report-Recommendation, dkt. # 99, is hereby ADOPTED, and:

1. Defendant Schroyer's motion for summary judgment, dkt. # 75, is hereby GRANTED in part and DENIED in part. The motion is denied with respect to Plaintiff's retaliation claims against Plaintiff and GRANTED in all other respects;

2. Defendant Schroyer's second motion for summary judgment is hereby accepted as filed. The Clerk of Court shall refer the motion to Magistrate Judge Peebles for a Report and Recommendation; and

3. The motion of summary judgment of Defendants Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web and Wingler, dkt. # 77, is hereby GRANTED in part and DENIED in part. The motion is DENIED with respect to Plaintiff's failure-to-protect claim against Defendants Blaise and Clancy and GRANTED in all other respects.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2016 WL 1639904

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Carter v. DeKalb County, Georgia, N.D.Ga., October
18, 2012

2011 WL 4478515
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Philip DeBLASIO, Plaintiff,
v.
David ROCK, et al., Defendants.

No. 9:09–CV–1077 (TJM/GHL).
|
Sept. 26, 2011.

**Attorneys and Law Firms**

Philip Deblasio, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Adele M. Taylor–Scott, Esq., of
Counsel, Albany, NY, for Defendants.

*MEMORANDUM DECISION AND ORDER*

THOMAS J. McAVOY, Senior District Judge.

 **\*1** In this *pro se* prisoner civil rights action, filed pursuant
to 42 U.S.C. § 1983, Plaintiff Philip DeBlasio alleges that
twenty-three employees of the New York Department
of Corrections and Community Supervision ("DOCCS")
violated his constitutional rights by denying him adequate
medical care, interfering with his right to exercise his
religion, subjecting him to excessive force, and subjecting
him to unconstitutional conditions of confinement. (Dkt.
No. 1.) Currently pending is Defendants' motion for
summary judgment. (Dkt. No. 55.) Plaintiff has not
opposed the motion, despite having been advised of the
consequences of failing to do so and having been granted
four extensions of the deadline by which to do so. (Dkt.
No. 55 at 3; Jan. 19, 2011, Text Order; Feb. 16, 2011,
Text Order; Mar. 31, 2011 Text Order; June 27, 2011, Text
Order.) For the reasons that follow, Defendants' motion
for summary judgment is granted in part and denied in
part.

**I. BACKGROUND**

Plaintiff, an inmate currently in DOCCS custody at Five
Points Correctional Facility, complains in this action
of a series of events that occurred at Great Meadow
Correctional Facility in 2006 and 2009. (Dkt. No. 1.)

**A. Incidents in 2006**

In his verified complaint, Plaintiff alleges that on
December 28, 2006, Defendant Physician Assistant Fisher
Nesmith stopped at his cell during sick-call rounds. (Dkt.
No. 1 at 11.) Plaintiff told Defendant Nesmith that he
needed to see the doctor for his chronic back pain and
herniated discs. *Id.* Defendant Nesmith would not allow
Plaintiff to see the doctor. *Id.* at 12. This happened
"several times" again after December 28, 2006. *Id.*

Plaintiff alleges that on December 28, 2006, Defendant
Correction Officer Kevin Holden was assigned to pack
Plaintiff's personal belongings because Plaintiff was
moving to a new cell. (Dkt. No. 1 at 12.) Thereafter, pages
were missing from each of Plaintiff's three copies of the
Koran. *Id.* One of the three Korans had to be destroyed
because it was missing so many pages. *Id.* Plaintiff alleges
that Defendant Holden is "defin[i]tely responsible" for the
missing pages because he "was the only person to pack
[P]laintiff's property ..." *Id.*

**B. Incident with Extraction Team**

Plaintiff alleges that one night in early August 2009 [1],
he complained of sharp pains in his left ribcage area
and blood in his urine. [2] (Dkt. No. 1 at 12.) Defendant
Correction Officer Kelsey Lenney told Plaintiff he would
call a nurse. [3] *Id.* After speaking with Defendant Nurse Della
Howley, Defendant Lenney returned twenty minutes later
and asked Plaintiff if he had requested a sick call. *Id.* at
12–13. Plaintiff was enraged and started banging the gate
and asking to see a sergeant. *Id.* at 13. When Defendant
Sergeant John Busse responded to the scene, Plaintiff
explained the situation and Defendant Busse said he
would take care of it. *Id.* Two hours after Plaintiff had first
complained of the pain, Defendant Howley arrived at his
cell "with a very negative attitude." *Id.* Plaintiff "was so
mad she wouldn't help him [that] he threw water at her and
hit [Defendant] Lt. Richard Juckett as well." *Id.*

[1]     Plaintiff's allegations about the precise dates on
        which the incidents in the complaint occurred are
        contradictory. Early in the complaint, he alleges that

he complained of the pain in his ribcage on "8–7–09." (Dkt. No. 1 at 12.) Later in the complaint, he says that "the next day" after the event was "9–7–09" and refers to it as "Friday morning of the same day." (Dkt. No. 1 at 14.) September 7, 2009, was a Monday. August 7, 2009, was a Friday. These discrepancies need not be resolved because the precise dates are irrelevant to the issues in this case.

2      Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.)

3      Defendant Lenney declares that he did, indeed, call Defendant Howley about Plaintiff. (Dkt. No. 55–9 ¶ 4.) Defendant Howley declares that she does not recall having a conversation with "the Correction Officer on duty" but that she remembers receiving a telephone call from Defendant Juckett asking her to check on Plaintiff. (Dkt. No. 56 ¶¶ 6–7.)

**\*2** After Plaintiff threw the water, an extraction team was mobilized to remove him from his cell. (Dkt. No. 1 at 13.) This team included Defendant Juckett, Defendant Busse, Defendant Correction Officer Adam Rivers, Defendant Lenney, Defendant Correction Officer Richard Dempster, and Defendant Correction Officer Richard Buell. *Id.*

According to Plaintiff, Defendant Juckett told Plaintiff that "he was going to OBS [4] one way or the other" even if Defendant Juckett "had to drag [P]laintiff out of the cell himself." *Id.* Plaintiff told Defendant Juckett that he was "not suicidal and should be sent to F–Block" as originally scheduled. *Id.* Defendant Juckett "was then just about to spray [P]laintiff in the face when [P]laintiff pleaded with him to take him out without gas[s]ing him ..." *Id.* In the complaint, Plaintiff alleges that the extraction team moved him to an observation room and then beat him with sticks, their fists, and their feet. *Id.* At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.)

4      The Residential Crisis Treatment Program, often referred to as "OBS", is a special observation area for inmates who cannot be controlled by security officers or who become unmanageable, suicidal, or homicidal. (Dkt. No. 55–2 ¶¶ 4–5.)

Defendants assert that they did not use any force on Plaintiff. Defendant Dempster declares that the only physical contact that any member of the extraction team

had with Plaintiff during the cell extraction was when Defendant Buell placed Plaintiff's wrists and legs in restraints. (Dkt. No. 55–5 ¶ 10; Dkt. No. 55–8 ¶ 18.) Defendant Dempster declares that Plaintiff "voluntarily complied with [a] strip frisk, which is standard procedure for inmates being processed into" the mental health unit. (Dkt. No. 55–5 ¶ 12; Dkt. No. 55–8 ¶¶ 20–21.) After that was done, the team "escorted [P]laintiff to an observation cell," which was "accomplished without incident." (Dkt. No. 55–5 ¶¶ 13–14.) Defendant Juckett declares that "[t]he only physical contact that I or any member of the extraction team had with Inmate DeBlasio that day was to place him in restraints, conduct a pat frisk, and be present when the inmate was subject to strip frisk." (Dkt. No. 55–8 ¶ 25.) Defendant Lenney declares that he "had no physical contact with inmate DeBlasio at all." (Dkt. No. 55–9 ¶ 20.) Defendant Rivers declares that he "had no physical contact with inmate DeBlasio during this engagement." (Dkt. No. 55–11 ¶ 13.)

After Plaintiff was secured in the observation cell, the extraction team members left the area, returned to their regular duties, and did not see Plaintiff again that day. (Dkt. No. 55–5 ¶¶ 15–16; Dkt. No. 55–3 ¶¶ 13–14; Dkt. No. 55–8 ¶ 22; Dkt. No. 55–9 ¶ 21; Dkt. No. 55–1 ¶ 12.) No paperwork was prepared documenting a use of force. (Dkt. No. 55–11 ¶ 14.) It is standard procedure to prepare a Use of Force Report when force is used on an inmate. *Id.*

Plaintiff alleges that after the extraction team left, he remained in the observation cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.) At his deposition he testified that he suffered only from "discomfort [and] bruises" as a result of the incident. (Dkt. No. 55–16 at 83:6–8.) About twenty-four hours after the incident, Plaintiff complained to an officer of chest pains. (Dkt. No. 56 at 2 ¶ 15, 5.) Plaintiff allowed Defendant Howley to examine him. *Id.* Plaintiff told Defendant Howley only that he had indigestion. *Id.* Defendant Howley found that Plaintiff had "no signs of distress." *Id.*

### C. Incident at Conference Room

**\*3** The day after the incident with the extraction team, Defendant Correction Officer Scott Hamel escorted Plaintiff to a conference room to be interviewed by Defendant Dr. Battu [5] and Defendant Social Worker Sarah Wetherell. [6] (Dkt. No. 1 at 14.) Dr. Battu had been asked to see Plaintiff to "possibly prescribe medications

to control his behavior or adjust medications that were already prescribed." (Dkt. No. 55–2 ¶ 9.) Dr. Battu often performs such interviews alone, but was accompanied by Defendant Wetherell "[b]ecause of the violent nature of this inmate." *Id.* ¶ 10. Defendant Wetherell had "worked with [P]laintiff for a number of years ... and [was] familiar with his history and patterns of behavior." (Dkt. No. 55–20 ¶ 3.) Defendant Wetherell declares that the RCTP Coordinator was also present. (Dkt. No. 55–20 ¶ 13.)

5    The parties spell this defendant's name in a variety of ways. In his declaration, he refers to himself as Kalyana Battu. (Dkt. No. 55–2 at 1.) Therefore, I have used that spelling.

6    The parties spell this defendant's name in a variety of ways. In her declaration, she refers to herself as Sarah Wetherell. (Dkt. No. 55–20 at 1.) Therefore, I have used that spelling.

Defendant Sergeant Crispin Murray declares that he supervised Defendant Hamel as he escorted Plaintiff to the appointment. (Dkt. No. 55–10 ¶ 5.) Once Plaintiff was in the conference room, Defendant Murray moved to a desk several feet away from the door to the room. (*Id.* ¶ 6; Dkt. No. 55–2 ¶ 11.)

Plaintiff alleges that he told Defendants Battu and Wetherell about the incident with the extraction team. (Dkt. No. 1 at 14.) He alleges that Defendant Battu said that it was none of his concern because he was just "there to handle medications and suicide prevention" and that because Plaintiff threw water at Defendant Howley he "may have deserved" what happened. *Id.* Plaintiff alleges that Defendant Wetherell "refused to comment or help [Plaintiff] in any way at all." *Id.* Plaintiff alleges that he called Defendant Wetherell "a snake sellout C.O. bitch" and she stormed out of the room and talked to Defendant Correction Officer Scott Hamel. *Id.* Dr. Battu declares that Plaintiff "became verbally abusive to Sarah Wetherell, nearly bringing her to tears, and when I tried to calm him down, [P]laintiff became abusive toward me." (Dkt. No. 55–2 ¶ 14.) Dr. Battu declares that Plaintiff's behavior "brought the interview to an end. The officer waiting outside moved in and escorted [P]laintiff out." (Dkt. No. 55–2 ¶ 15.) Defendant Wetherell declares that when "the session started to get hostile, the RCTP Coordinator stood up, and in doing so triggered a prearranged signal to security personnel to move in." (Dkt. No. 55–20 ¶ 19.)

Plaintiff alleges that Defendant Hamel entered the conference room and rushed Plaintiff into a cell. (Dkt. No. 1 at 14.) Defendant Hamel declares that he entered the conference room because "I believe I observed [Plaintiff] stand up during the interview in disobedience of my direct order to him not to do so. When the inmate stood up, I automatically moved in, took control of the restraints, and escorted him out of the room and back to his observation cell." (Dkt. No. 55–7 ¶ 9.) Defendant Murray declares that when a "problem occurred in the interview room," he supervised Defendant Hamel as Defendant Hamel escorted Plaintiff back to his cell and Defendant Stemp joined them "to provide additional security coverage." (Dkt. No. 55–10 ¶¶ 7–9.)

**\*4** The parties dispute what happened next. Defendant Hamel declares that before he placed Plaintiff in his cell, he asked him if he wanted to take a shower because inmates in the observation unit generally take showers on Mondays, Wednesdays, and Fridays. (Dkt. No. 55–7 ¶ 10.) Defendant Hamel declares that Plaintiff declined and then turned and head-butted him, hitting Defendant Hamel's forehead just over his left eye and splitting the skin open. *Id.* ¶ 11. Defendants Murray and Stemp also declare that Plaintiff head-butted Defendant Hamel. (Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Defendant Hamel declares that he "instinctively" pushed Plaintiff "forward and down to the floor with my left hand" and that Plaintiff banged his head on the way down. (Dkt. No. 55–7 ¶ 12.) Defendant Hamel declares that Plaintiff did not stay down and kept kicking and trying to bite Defendant Hamel. *Id.* ¶ 13. Defendant Murray declares that he ordered Defendant Stemp to "go in and pull the inmate out of the cell so they could get control of him." (Dkt. No. 55–10 ¶ 13.) Defendant Hamel declares that he and Defendant Stemp "used the wrist restraints to lift [Plaintiff] out of the cell and onto the floor in the hallway." (Dkt. No. 55–7 ¶ 16.) Defendant Hamel declares that once Plaintiff was on the floor in the hallway, he took control of Plaintiff's legs while Defendant Stemp took control of Plaintiff's upper body. *Id.* ¶ 17. Defendant Stemp declares that he took control of Plaintiff's upper body by putting one knee on his back and the other on his head until he calmed down. (Dkt. No. 55–19 ¶ 10.) Defendant Hamel declares that Plaintiff calmed down and they all remained that way until Defendant Hamel and Defendant Stemp were relieved by other staff. (Dkt. No. 55–7 ¶ 18.)

Defendant Stemp declares that he "used only such force as was necessary to subdue the inmate. Nobody kicked, punched or otherwise asserted unnecessary force against" Plaintiff. (Dkt. No. 55–19 ¶ 13.) Defendant Murray declares that he "personally did not have any physical contact with the inmate." (Dkt. No. 55–10 ¶ 16.) Defendant Murray declares that given Plaintiff's "unprovoked assault on the escorting officer, his attempts to further assault the officer during the course of the take-down, and his refusal to comply with staff direction, I do not believe that ... the actions of the men under my supervision violated any of [P]laintiff's federally protected rights." *Id.* ¶ 21.

Plaintiff's version of this incident is quite different. In his verified complaint, Plaintiff alleges that after Defendant Hamel escorted him to his cell, Defendants Stemp and Murray came into the cell. (Dkt. No. 1 at 14.) Plaintiff alleges that Defendant Murray removed Plaintiff's handcuffs, said "how tough are you now disrespecting Nurse Howley and Wetherell and Dr. Battu," and slapped Plaintiff on the left side of his face with an open hand. *Id.* All of the officers then beat Plaintiff, got him onto his stomach, handcuffed him, and kicked him several more times in the face, head, and body. *Id.* at 14–15. At his deposition, Plaintiff testified that he did not do anything to any of the officers until Defendant Murray removed his handcuffs and punched him in the face. Plaintiff testified that it was only then that "I put my hands up and I started fighting with him." (Dkt. No. 55–16 at 99:12–100:17.)

**\*5** When the relief officers arrived, Defendants Murray, Stemp, and Hamel escorted Plaintiff to the clinic to be examined for injuries. (Dkt. No. 55–10 ¶ 17.) Plaintiff and the officers were examined and photographed and Defendant Murray completed a Use of Force Report. (Dkt. No. 55–10 ¶ 18.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

### D. Conditions of Confinement

Plaintiff alleges that after this incident he was subjected to various harsh conditions of confinement. (Dkt. No. 1 at 15.)

#### 1. *Handcuff Incident with Defendant Segovis*

Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Roswell Segovis handcuffed Plaintiff to take him to the shower. (Dkt. No. 1 at 15.) Defendant Segovis noticed that Plaintiff was wearing socks and refused to let him shower. *Id.* He then left Plaintiff handcuffed in his cell for five hours. *Id* . Plaintiff pleaded with Defendant Segovis to remove the handcuffs so that he could use the bathroom. *Id.* Defendant Segovis refused and after several hours Plaintiff "had no choice but to wet his pants and then defecate on himself." *Id.* Defendant Segovis declares that he left Plaintiff handcuffed because Plaintiff "took the handcuffs hostage and refused to put his hands through the feed-up slot so that they could be removed." (Dkt. No. 55–18 ¶ 4.)

Later, Defendant Segovis issued a misbehavior report charging Plaintiff with committing an unhygienic act. (Dkt. No. 1 at 15.) The hearing officer sentenced Defendant to seven days of restricted diet. *Id.* Defendant First Deputy Superintendent Jeffrey Tedford "co-signed" the order for restricted diet. *Id.* The punishment "was brought to the attention" of Defendant Sergeant David Winchip, who "was going along with the entire [charade]." *Id.*

#### 2. *Hot Water*

Plaintiff alleges that he was not able to get hot water because he was not given a bucket. (Dkt. No. 1 at 17.) On August 19, 2009, Plaintiff asked Defendant Sergeant Peter DePalo for hot water. (Dkt. No. 1 at 17.) Defendant DePalo said "Muslims don't deserve hot water. You'll get that when you get to hell." *Id.* On August 24, 2009, Plaintiff told a watch commander, in the presence of Defendant Winchip, that he was not receiving hot water. *Id.* at 18. Defendant Winchip said he would see to it that Plaintiff got a bucket for hot water. *Id.* Later that day, Defendant Winchip came to Plaintiff's cell and said "You won't get that bucket[ ] today you dirty white Muslim wigger." *Id.*

#### 3. *Drinking Water*

Plaintiff alleges that he once went without water for a week. (Dkt. No. 1 at 15.) He alleges that during the week that he went without water, Defendant Correction Officer William Powers was responsible for turning on Plaintiff's water and failed to do so. (Dkt. No. 1 at 6.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150: 2–5, 6–9.)

### 4. *Food*

**\*6** Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Alan White and Defendant Segovis played with Plaintiff's breakfast tray and Plaintiff had to plead with them in order to get it. (Dkt. No. 1 at 16.) At lunch [7] Defendant White gave Plaintiff only a quarter cup of juice to drink and no lunch tray. *Id.* Later, Defendant DePalo came to Plaintiff's cell asking for the empty lunch tray. *Id.* Plaintiff told him that he was never given a lunch tray. *Id.* Defendant DePalo looked under Plaintiff's bed and did not see a tray. *Id.* That night at dinner an officer served Plaintiff a special diet loaf instead of regular food and told him that he would receive it for seven days as punishment for not giving back his lunch tray. *Id.* This punishment was ordered by Defendants White and Segovis and "co-signed" by Defendant DePalo. *Id.* at 17. Plaintiff asserts that Defendants White and Segovis "have a history" with him and "blatantly harass[ed]" Plaintiff "to disturb his Fast of Ramadan." *Id.* at 16–17.

[7]      It is unclear when Plaintiff went to lunch on August 18, 2009, because, as discussed above, he alleges that he was handcuffed in his cell from 8:00 a.m. to 1:00 p.m. (Dkt. No. 1 at 15.)

Plaintiff alleges that on one occasion, Defendant Segovis gave Plaintiff pork instead of the special diet loaf. *Id.* Defendant Segovis said "You know you want to eat some swine." *Id.* at 18.

### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed to move outside his cell at all when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.)

### 6. *Showers*

Plaintiff alleges that on one occasion, Defendant Segovis would not allow Plaintiff to shower. *Id.* When Plaintiff reported this to Defendant DePalo, he said "That's life in F-block for Muslims." *Id.*

### 7. *Bibles*

Plaintiff alleges that on August 31, 2009, a chaplain came to Plaintiff's cell to deliver two Bibles. (Dkt. No. 1 at 16.) Defendants Powers and Segovis told the chaplain to leave the Bibles and that they would give them to Plaintiff when they were not busy. *Id.* Defendant Powers

came to Plaintiff's cell and "said [he] was banging all day." *Id.* Plaintiff said it was not him who was banging. *Id.* Defendant Powers said he would investigate and that Plaintiff would not be getting his Bibles. *Id.* On or about September 8, 2009, Defendant Powers came to Plaintiff's cell, told him he had discovered that it was not Plaintiff who was banging, and apologized. *Id.* However, he did not give Plaintiff his Bibles. *Id.* The record shows that Plaintiff received the Bibles on September 12, 2009. [8] (Dkt. No. 55–6 at 28.)

[8]      Plaintiff signed the complaint in this action on September 10, 2009. (Dkt. No. 1.) Thus, he had not received the Bibles when he wrote the complaint. Because Plaintiff has not opposed the motion for summary judgment, it is unclear whether he wishes to continue asserting the claim regarding the Bibles.

### E. Restrictions on Religious Practice

Plaintiff claims that Defendant Superintendent David Rock and Defendant CORC Director Karen Bellamy violated his religious rights in three ways. (Dkt. No. 1 at 18.) First, he alleges that he was not allowed to demonstratively pray in the BHU recreation pen. *Id* . Plaintiff alleges that Defendant Rock allows Christians to pray but "is obviously discriminating against the Muslims" by prohibiting demonstrative prayer. *Id.* at 18–19. Second, he alleges that BHU and SHU inmates are not allowed to have razors, which prevents Muslims from shaving their pubic and armpit hair as required by their faith. *Id.* at 19. Third, Plaintiff alleges that he is not given Halal food. *Id.*

### F. Procedural History

**\*7** Plaintiff filed his complaint in this Court on September 23, 2009. (Dkt. No. 1.) Plaintiff's complaint sets forth three causes of action: (1) religious discrimination; (2) "assault and cruel and unusual punishment at the hands of DOCS workers"; and (3) a request that Plaintiff receive "proper medical attention at all times." (Dkt. No. 1 at 20.) Plaintiff requests injunctive relief (being allowed to pray in the recreation pen, being allowed to shave his pubic hair, and given Halal food) and damages. *Id.* at 21.

Defendants now move for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [9] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Major League Baseball Props., Inc. v. Salvino, 542 F.3d 290, 309 (2d Cir.2008).

[9]    A fact is "material" only if it would have some effect on the outcome of the suit. Anderson, 477 U.S. at 248.

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine whether any facts are disputed in the record presented on the defendants' motion, and (2) determine whether, based on the *undisputed* material facts, the law indeed warrants judgment for the defendants. See Champion, 76 F.3d at 486; Allen v. Comprehensive Analytical Grp., Inc., 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." Schwartz v. Compagnie Gen. Transatlantique, 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

**\*8** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " Ashcroft v. Iqbal, ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." Id. at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. Failure to Exhaust Administrative Remedies Regarding Claims Against Defendants Nesmith and Holden

Plaintiff alleges that Defendant Nesmith would not allow Plaintiff to see a doctor for back pain and that Defendant Holden ripped pages from Plaintiff's Korans. (Dkt. No. 1 at 11–12.) Defendants argue that these claims should be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 55–23 at 13–14.) Defendants are correct.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010).

**\*9** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal

resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at (c).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at (d).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Jeffrey Hale, the Assistant Director of the Inmate Grievance Program for DOCCS, declares that there "are no CORC appeal records that correspond to the December 28, 2006, events as alleged in [P]laintiff's complaint regarding back pain or the loss of personal or religious property at the Great Meadow Correctional Facility." (Dkt. No. 55–6 ¶ 7.) CORC records show that Plaintiff did not file any CORC appeals between October 2006 and October 2008. (Dkt. No. 55–6 at 5.) Indeed, Plaintiff admitted at his deposition that he did not properly exhaust his administrative remedies regarding Defendant Holden's alleged desecration of the Korans. [10] (Dkt. No. 55–16 at 57:17–58:5.) Therefore, Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Nesmith and Holden.

[10]     Plaintiff was not able to recall any of the details about the incident with Defendant Nesmith. (Dkt. No. 55–16 at 37–41.)

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v.*

*New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). [11] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

[11]   The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

**\*10** Here, as discussed above, an administrative remedy was available to Plaintiff. Defendants preserved the exhaustion defense by asserting it in their answer to the complaint. (Dkt. No. 39 ¶ 18.) The record before the Court on this unopposed motion for summary judgment indicates neither that Defendants should be estopped from asserting the defense nor any special circumstances justifying Plaintiff's failure to exhaust his administrative remedies. Therefore, the Court grants Defendants' motion for summary judgment dismissing the claims against Defendants Nesmith and Holden.

**B. Claims Regarding Failure to Provide Medical Care**

Plaintiff alleges that Defendants Buell, Busse, Dempster, Howley, Juckett, Lenney, and Rivers [12] failed to provide him with adequate medical care. (Dkt. No. 1at 11–14.) Defendants argue that there are "neither objective nor subjective facts to support Plaintiff's conclusory medical indifference claim." (Dkt. No. 55–23 at 14–17.) Defendants are correct.

[12]   Defendants characterize the complaint as asserting Eighth Amendment medical care claims against only Defendants Nesmith, Howley, and Battu. (Dkt. No. 55–23 at 14.)

1. *Defendants Lenney, Busse, and Howley*
Plaintiff alleges that Defendants Lenney, Busse, and Howley failed to adequately respond to his complaints of ribcage pain and blood in his urine. (Dkt. No. 1 at 12–13.)

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

The undisputed facts show that Plaintiff did not suffer from a serious medical condition. A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. Here, Plaintiff alleges that he complained to Defendants Lenney, Busse, and Howley of "sharp pains in his left ribcage area and the pissing of blood." (Dkt. No. 1 at 12.) Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.) When Plaintiff allowed Defendant Howley to examine him the next day, he stated only that he had indigestion. (Dkt. No. 56 at 5.) There is no evidence that Plaintiff's ribcage pain and the blood he reported in his urine significantly affected his daily activities or caused

him chronic and substantial pain. The record before the Court, therefore, does not reflect that Plaintiff suffered from "a condition of urgency, one that may produce death, degeneration, or extreme pain."

**\*11** Even if Plaintiff had raised a triable issue as to the objective prong of his Eighth Amendment medical care claim against Defendants Lenney, Busse, and Howley, the Court would grant summary judgment on this claim because Plaintiff has not raised a triable issue of fact that any of these Defendants were deliberately indifferent to his medical needs. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Defendants Lenney and Busse are correction officers, not medical staff members. (Dkt. No. 1 at 8; Dkt. No. 55–9 ¶ 1.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care where the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999). Here, as discussed above, there is no evidence that Plaintiff was in "extreme pain." Moreover, the undisputed facts show that neither Defendant Lenney nor Defendant Busse intentionally delayed Plaintiff's access to medical care. Defendant Lenney declares that he called Defendant Howley regarding Plaintiff's complaints of pain. (Dkt. No. 55–9 ¶ 4.) By Plaintiff's own admission, Defendant Howley came to his cell two hours after he first complained of pain. (Dkt. No. 1 at 13.) A two-hour wait for medical care is not the type of delay that indicates deliberate indifference. *See Baumann,* 36 F.Supp.2d at 512 (denying defendants' motion to dismiss where plaintiff alleged that correction officer delayed care for his injured arm for three weeks). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Lenney and Busse.

Regarding Defendant Howley, to establish deliberate indifference on the part of medical staff, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference.

*Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). The undisputed facts show that Defendant Howley came to Plaintiff's cell to tend to his pain but that Plaintiff threw toilet water on her before she could examine him. (Dkt. No. 1 at 13; Dkt. No. 56 ¶ 11.) Thus, the undisputed facts show that the failure to provide immediate care to Plaintiff was the result of his own conduct rather than any conscious and intentional disregard on the part of Defendant Howley. Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claim against Defendant Howley.

### 2. *Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers*

**\*12** Plaintiff alleges that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) violated his Eighth Amendment rights by leaving him in a cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.)

The undisputed facts show that Plaintiff did not suffer from any serious medical condition as a result of the incident with the extraction team. Plaintiff testified that he suffered from "discomfort [and] bruises" from the incident. (Dkt. No. 55–16 at 83:6–8.) Superficial injuries such as bruises are not "serious medical conditions." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 354 (N.D.N.Y.2010). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers.

### C. Excessive Force Claim Against the Extraction Team

Plaintiff claims that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) used excessive force. (Dkt. No. 1 at 13.) Defendants do not explicitly address Plaintiff's Eighth Amendment excessive force claim regarding the extraction team, although their memorandum of law requests that "[P]laintiff's complaint be dismissed, *in its entirety,* and without leave to replead" and states, in the section regarding medical care, that "the extraction team did not use any force against [P]laintiff." (Dkt. No. 55–23 at 16

and 30, emphasis added.) The Court finds that Plaintiff has, just barely, raised a triable issue of material fact on this issue.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9.

**\*13** Here, Plaintiff's verified complaint alleges that the members of the extraction team beat Plaintiff with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.) If Plaintiff's version of events is credited, Defendants' use of force was more than *de minimis* despite the fact that Plaintiff suffered only bruises and discomfort as a

result. *Cf. Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking an inmate's ankles and feet during a pat frisk is *de minimis* and insufficient to rise to the level of a constitutional violation); *Show v. Patterson,* 955 F.Supp. 182, 192–93 (S.D.N.Y.1997) (pushing inmate against wall with hands and no use of weapons *de minimis* use of force); *Anderson v. Sullivan,* 702 F.Supp. 424, 425–27 (S.D.N.Y.1988) (pushing inmate's face into a bar while applying handcuffs not significantly disproportional to the goal of handcuffing plaintiff).

Defendants flatly contradict Plaintiff's version of events. The members of the extraction team declare that the only physical contact any of them had with Plaintiff was to place him in restraints, pat frisk him, and strip frisk him. (Dkt. No. 55–8 ¶ 25; Dkt. No. 55–9 ¶ 20; Dkt. No. 55–11 ¶ 13.)

Given these conflicting versions of events, the Court is called upon to weigh the parties' credibility. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). Under this exception, in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete" and the plaintiff's evidence is contradicted by evidence produced by the defendants, the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

Here, although Plaintiff is relying exclusively on his own testimony and his evidence is contradicted by evidence produced by Defendants, the *Jeffreys* exception does not apply because Plaintiff's testimony is not "contradictory and incomplete." The complaint and deposition testimony are moderately contradictory. In the complaint, Plaintiff alleges that the extraction team members beat him with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) However, at his deposition, Plaintiff testified that the team

members hit him only with their fists. (Dkt. No. 56–16 at 84:17–19.) However, this is far less contradictory than the plaintiff's statements in *Jeffreys.* There, the plaintiff, who alleged that a group of police officers beat him and threw him out of a third-floor window, confessed on at least three occasions that he had jumped rather than having been thrown. *Jeffreys,* 426 F.3d at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Plaintiff's deposition and complaint are also far less contradictory than cases in which courts have applied *Jeffreys* to make credibility determinations at the summary judgment stage. *See Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, at *24–26, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (collecting cases). [13] Therefore, although this is a very close question, the Court finds that Plaintiff has raised a triable issue of fact that Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers used excessive force against him. Accordingly, the Court denies Defendants' motion for summary judgment dismissing this claim.

[13]    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### D. Claims Against Defendants Battu and Wetherell

**\*14** Plaintiff alleges that he reported the incident with the extraction team to Defendants Battu and Wetherell, that they refused to get involved, and that Defendant Battu told him that he may have deserved the way he was treated. (Dkt. No. 1 at 14.) Defendants move to dismiss these claims, arguing that Plaintiff has failed to allege that Defendants Battu and Wetherell were personally involved in any constitutional violation. (Dkt. No. 55–23 at 11–12.) Plaintiff's allegations against Defendant Battu and Wetherell are properly analyzed as a failure-to-intervene claim. On that claim, summary judgment in favor of Defendants is appropriate.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a reasonable jury could not conclude that Defendants Battu and Wetherell failed to intervene with an ongoing constitutional violation. The undisputed facts show that Plaintiff did not tell Defendants Battu and Wetherell about the incident with the extraction team until several hours after it was over. (Dkt. No. 1 at 13–14.) Even if one fully credits Plaintiff's version of events, Defendants Battu and Wetherell did not have any realistic opportunity to intervene and prevent the harm. Therefore, Defendants' motion for summary judgment dismissing the claims against Defendants Battu and Wetherell is granted.

### E. Excessive Force Claim Against Defendants Hamel, Murray, and Stemp

Plaintiff contends that Defendants Hamel, Murray, and Stemp subjected him to excessive force as directed by Defendants Battu and Wetherell. (Dkt. No. 1 at 14–15; Dkt. No. 55–16 at 93:14–95:3.) Defendants' memorandum of law does not address this excessive force claim.

As discussed above in Section I(C), the parties dispute what happened when Plaintiff was removed from the conference room. Plaintiff alleges that Defendants Hamel, Murray, and Stemp beat him and then kicked him while he was handcuffed. (Dkt. No. 1 at 14–15.) Defendants contend that Plaintiff head-butted Defendant Hamel without provocation and that they used only enough force to bring him under control. (Dkt. No. 55–7 ¶ 11; Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks,

a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

**\*15** Given the parties' conflicting versions of events and Defendants' failure to address the claim, the Court finds that the excessive force claim against Hamel, Murray, and Stemp survives summary judgment.

However, there is no competent evidence that Defendants Battu and Wetherell were involved in the incident. Although Plaintiff claims that they ordered the use of force, he does not have any personal knowledge to support that opinion. To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." Fed.R.Civ.P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1999) (citations omitted). Therefore, the claim that Defendants Battu and Wetherell ordered Defendants Hamel, Murray, and Stemp to beat Plaintiff is dismissed.

### F. Conditions of Confinement Claims

Plaintiff alleges that Defendants DePalo, Powers, Segovis, Tedford [14], White, and Winchip subjected him to cruel and unusual punishment by subjecting him to harsh conditions of confinement. [15] (Dkt. No. 1 at 15–18.) Defendants argue that Plaintiff has "failed to allege a plausible Eighth Amendment claim" regarding the conditions of his confinement. (Dkt. No. 55–23 at 17–20.)

[14]  Defendants do not address the claim against Defendant Tedford.

[15]  Plaintiff does not assert that Defendants subjected him to these conditions of confinement in retaliation for any protected conduct. (Dkt. No. 1 at 20.) Therefore, I will address the conditions of confinement claims solely under Eighth Amendment standards.

### 1. Handcuff Incident with Defendant Segovis

Plaintiff alleges that Defendant Segovis violated his Eighth Amendment rights by leaving Plaintiff handcuffed in his cell for five hours while Plaintiff pleaded to be un-handcuffed so he could use the bathroom. (Dkt. No. 1 at 15.) Defendants argue that this claim should be dismissed because there is "neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform a cell extraction to retrieve [the handcuffs]." (Dkt. No. 55–23 at 19.) Defendants are not entitled to summary judgment on this claim because Plaintiff's verified complaint raises a triable issue of fact that Defendant Segovis subjected him to unconstitutional conditions of confinement.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. Estelle v. Gamble, 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." Estelle, 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

**\*16** To satisfy the objective component of an Eighth Amendment conditions of confinement claim, "the deprivation alleged must be, objectively, 'sufficiently serious.' " Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." Hudson v.

*McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

To satisfy the subjective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Defendants' extremely spare argument regarding Plaintiff's claim against Defendant Segovis states, in full:

> Plaintiff alleges that on August 18, 2009, he presented himself for shower in socks and was left locked in the cell with handcuffs on for several hours by Defendant Segovis. The only reason security staff would leave an inmate handcuff[ed] in their cell is if they "kidnapped" the cuffs, and [P]laintiff refused to put his hand and wrists through the modified feed-up slot to allow the officer Segovis to remove the cuffs. Once again, [P]laintiff's refusal to comply with staff direction and facility procedures resulted in a reasonable and foreseeable deprivation. These facts, moreover, provide neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform[ ] a cell extraction to retrieve them, for both [P]laintiff and staff. Plaintiff was not subjected to a serious risk of harm, and the circumstance was not the result of deliberate indifference to inmate health or safety such as to give rise to an Eighth Amendment

cause of action. *Gaston v. Coughlin,* 249 F.2d at 16.

(Dkt. No. 55–23 at 19, citations to record omitted.) Defendants do not address Plaintiff's allegation that he pleaded with Defendant Segovis to release him from his handcuffs so that he could use the bathroom or his allegation that he ultimately urinated and defecated on himself.

Defendants cite only *Gaston v. Coughlin,* 249 F.3d 156 (2d Cir.2001)[16] to support their argument. In that case, the Second Circuit held that a triable issue of fact existed on a conditions of confinement claim where the prisoner alleged that, *inter alia,* the area directly in front of his cell was filled with human feces, urine, and sewage water for several days. Although it is not entirely clear, Defendants may be arguing that Plaintiff's claim should be dismissed because his allegations are not as dire as those asserted by the plaintiff in *Gaston.* However, a reasonable juror, if he or she credited Plaintiff's version of events, could find that being handcuffed for five hours while pleading to be released in order to use the bathroom is an extreme deprivation. Similarly, a reasonable juror who credited Plaintiff's version of events could find that Defendant Segovis was deliberately indifferent. Therefore, Defendants' motion for summary judgment dismissing the claim against Defendant Segovis regarding the handcuffing incident is denied.

[16]     As noted in the block citation, Defendants cite this case as "249 F.2d at 16." (Dkt. No. 55–23 at 19.)

### 2. *Hot Water*

**\*17** Plaintiff alleges that he was denied hot water on several occasions. (Dkt. No. 1 at 17.) Defendants move for summary judgment, arguing that the claim should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. The denial of hot water in an inmate's cell fails to state an Eighth Amendment claim because it does "not constitute [a] serious deprivation[ ] of basic human needs." *Graham v. Perez,* 121 F.Supp.2d 317, 323 (S.D.N.Y.2000). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to provide him with a bucket for hot water is granted.

### 3. *Drinking Water*

Plaintiff's complaint alleges that he was denied drinking water in his cell for a week. (Dkt. No. 1 at 15.) In his complaint and at his deposition, Plaintiff alleged that Defendant Powers was responsible for this deprivation because he failed to turn Plaintiff's water on. (Dkt. No. 1 at 16; Dkt. No. 55–16 at 152:18–19.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150:3–5, 9–12.) Defendants' memorandum of law does not discuss this claim.

Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects. *Compare Johnson v. Comm'r of Corr. Servs.,* 669 F.Supp. 1071, 1074 (S.D.N.Y.1988) (prisoner confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals) *with Atkins v. County of Orange,* 372 F.Supp.2d 377, 406 (S.D.N.Y.2005) (inmate raised triable issue of fact that the defendants subjected her to unconstitutional conditions of confinement by depriving her of water in her cell for almost one month despite fact that they provided her with fluids at meals where medical records showed inmate suffered adverse effects from water deprivation). Here, Plaintiff received juice at meals. (Dkt. No. 55–16 at 152:9–13.) There is no evidence that Plaintiff suffered any adverse effects from water deprivation. Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the deprivation of drinking water.

#### 4. *Food*

Plaintiff alleges that Defendants interfered with his food on several occasions. Specifically, he alleges that (1) Defendants White and Segovis forced Plaintiff to plead with them before they gave him his breakfast tray on August 18, 2009 (Dkt. No. 1 at 16); (2) Defendant White gave Plaintiff only juice for lunch one day (Dkt. No. 1 at 16); Defendants White, Segovis, DePalo, and Tedford punished him by restricting him to a special loaf diet (Dkt. No. 1 at 15, 16–17); and (4) Defendant Segovis gave him pork instead of his special diet on one occasion (Dkt. No. 1 at 18). Defendants move for summary judgment dismissing these claims, arguing that "such deprivations are *de minimis* and do not rise to a level of constitutional significance ..." (Dkt. No. 55–23 at 18.) Defendants are correct.

**\*18** Plaintiff's allegations that he was denied food at lunch one day, given a diet he did not like as punishment, and given food that his religion does not allow him to eat on one occasion are insufficient to raise a triable issue of fact that Defendants violated his Eighth Amendment rights. *See Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal); *Shakur v. Selsky,* 391 F.3d 106 (2d Cir.2004) (prisoner stated *First Amendment* claim where he alleged that he was denied one religiously significant feast). Therefore, the Court dismisses Plaintiff's Eighth Amendment claims regarding the denial of food.

To the extent that Plaintiff claims that the imposition of the loaf diet violated his right to due process, the claim is *sua sponte* dismissed. In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). An inmate has a liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, any due process claim regarding the loaf diet is dismissed.

#### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed "any recreation or any movement outside his cell" when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.) Defendants do not address this claim in their memorandum of law. [17]

[17]     Although Defendants do not discuss the issue in their memorandum of law, Defendant Segovis declares that inmates in the Special Housing Unit have one recreation period per day, for which they are required to sign up in advance. (Dkt. No. 55–18 ¶ 16.)

Defendant Segovis escorts any inmates who sign up to recreation. *Id.* ¶ 17. Defendant Segovis declares that Plaintiff "rarely signed up for recreation" during his shift. *Id.* ¶ 18.

Prisoners have the right under the Eighth Amendment to be allowed "some opportunity for exercise." *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996). Plaintiff's complaint, however, does not plausibly allege facts suggesting that this right was violated. Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim. *See Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (officers who denied inmate outdoor exercise for twenty-two days did not violate Eighth Amendment). Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the denial of recreation and movement.

### 6. *Showers*

Plaintiff alleges that Defendant Segovis would not allow him to shower on August 19, 2009. (Dkt. No. 1 at 17.) Plaintiff alleges that when he told Defendant DePalo that he had not been allowed to shower, Defendant DePalo said "That's life in F-block for Muslims." *Id.* Defendants do not address this claim in their memorandum of law. [18]

[18]  Although Defendants' memorandum of law does not address this claim, Defendant DePalo declares that at "no time did I derogate [P]laintiff's religion or act in an unprofessional manner toward him ." (Dkt. No. 55–4 ¶ 23.)

**\*19** The denial of one shower does not violate the Eighth Amendment. *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' "). Therefore, the Court dismisses Plaintiff's claim *sua sponte.*

### 7. *Bibles*

Plaintiff alleges that Defendants Segovis and Powers refused to give Plaintiff two Bibles that a chaplain delivered for him. (Dkt. No. 1 at 16.) Defendants' memorandum of law does not address this claim.

The allegation about the Bibles fails to state an Eighth Amendment claim because Plaintiff does not plausibly allege that he was denied "the minimal civilized measure of life's necessities" as a result of the deprivation. The

Court can find no authority suggesting that even a permanent deprivation of the Bibles would rise to that level. Here, Plaintiff received the Bibles twelve days after the chaplain originally delivered them. (Dkt. No. 55–6 at 28.) Therefore, Plaintiff's Eighth Amendment claim regarding the Bibles is *sua sponte* dismissed.

The allegation about the Bibles also fails to state a procedural due process claim. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, Plaintiff's claim regarding the deprivation of the two Bibles is dismissed.

### 8. *Verbal Abuse*

Defendants argue that, to the extent that Plaintiff alleges that his constitutional rights were violated by comments by Defendants DePalo and Winchip regarding Muslims, such claims should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. Verbal harassment, in and of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, Defendants' motion for summary judgment dismissing these claims is granted.

### G. Religion Claims

**\*20** Plaintiff alleges that Defendants Rock and Bellamy [19] violated his right to exercise his religion. (Dkt. No. 1 at 18–19.) Defendants move for summary judgment of these claims. (Dkt. No. 55–23 at 20–28.)

[19]    Plaintiff alleges that Defendants Rock and Bellamy are responsible for violating his religious rights. (Dkt. No. 1 at 18.) Defendant Rock, who was the Superintendent of Great Meadow when Plaintiff was incarcerated there, was "responsible for the overall administrative functioning of the facility." (Dkt. No. 55–12 ¶ 3 .) He was therefore personally involved in the implementation of the Directive at Great Meadow. The evidence does not show, however, any personal involvement by Defendant Bellamy with implementation of the Directive at Great Meadow. Defendant Bellamy is the Director of the Inmate Grievance Program. (Dkt. No. 55–6 ¶ 12.) Therefore, Defendants' motion for summary judgment dismissing the claims against Defendant Bellamy for lack of personal involvement (Dkt. No. 55–23 at 12) is granted. Hereafter, I will refer to Plaintiff's religion claims as being brought solely against Defendant Rock.

### 1. *Meals*

Plaintiff alleges that Defendant Rock violated his right to exercise his religion because Great Meadow Correctional Facility does not provide a Halal diet. (Dkt. No. 1 at 19.) Defendants move for summary judgment dismissing this claim, arguing that the religious alternative meals provided at Great Meadow meet Plaintiff's religious dietary requirements. (Dkt. No. 55–23.) Defendants are correct.

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws." *Muhammad v. Warithu–Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul–Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at \*6 (S.D.N.Y. Feb. 27, 1997)). [20]

[20]    Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 105.)

Defendant Rock declares that DOCCS "has proscribed the use of what is called a [ ] Religious Alternative Meal program to accommodate non[-]Kosher religious dietary requirements." (Dkt. No. 55–12 ¶ 47.) He further declares that the alternative meal "provides a nutritionally adequate diet and meets Islamic requirements regardless of sect." *Id.* ¶ 50. Courts have consistently held that DOCCS' Religious Alternative Meal is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required. *Muhammad,* 98 F.Supp.2d at 343–44 (collecting cases). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the failure to provide Halal meals is granted.

### 2. *Restrictions on Demonstrative Prayer*

DOCCS Directives limit prisoners' freedom to demonstratively pray. Specifically, DOCCS Directive 4202(k) states that "[i]ndividual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters and in designated religious areas whenever feasible as determined by the Superintendent." (Dkt. No. 55–12 ¶ 9.) Plaintiff argues that the Directive as implemented at Great Meadow violates his right to practice his religion. (Dkt. No. 1 at 18, 20.) Defendants argue that this claim should be dismissed. (Dkt. No. 55–23 at 25–26.) The Court will address this claim under both the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

#### a. *First Amendment*

Prisoners retain some measure of the constitutional right to the free exercise of religion guaranteed by the First Amendment. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Id.* Thus, a prison regulation that denies a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right

passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

**\*21** To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [21] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature [22]. *Ford,* 352 F.3d at 590. Here, there is no dispute that Plaintiff sincerely believes that his religion requires him to demonstratively pray several times each day.

[21] Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

[22] However, in some cases "an asserted belief might be so bizarre, so clearly nonreligious in motivation, so as not to be entitled to protection." *Frazee v. Illinois Dept. Of Employment Security,* 489 U.S. 829, 834 n. 2, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989).

A prisoner's sincerely held religious belief is "substantially burdened" "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d

Cir.1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock.").

Defendants argue that the Directive does not substantially burden Plaintiff's sincerely held religious beliefs because Plaintiff "has also admitted that prayer times do not always coincide with recreation times and that he is only forced to choose occasionally." (Dkt. No. 55–23 at 26, citing Dkt. No. 55–16 (Plaintiff's deposition) at 164–65.)

Defendant Rock declares that:

> An inmate housed at Great Meadow who wishes to pray during his recreation period has alternatives to demonstrative prayer in the yard. First, the inmate can make silent, non-demonstrative prayers while in Great Meadow's recreation yard. In addition, an inmate may choose to remain in his cell during the recreation period and, while in his cell, the inmate may pray demonstratively as he wishes. An inmate may choose to go back to his cell during a designated "go back," whereby inmates may return to their cells from the recreation yard under the supervision of staff at a scheduled time. "Go Back" periods, however, are limited, and may not coincide with the exact point in time that an inmate wishes to perform the Salaah, inasmuch as inmates must be escorted while they are transported from the recreation yard to their cells, and vice versa, and [ ] only a finite number of correction officers work at Great Meadow at any time.

(Dkt. No. 55–12 ¶¶ 24–28.)

Defendant Rock asserted the same argument in *Smith v. Artus,* No. 9:07–CV–1150, 2010 U.S. Dist. LEXIS 104660,

2010 WL 3910086 (N.D.N.Y. Sept.30, 2010). [23] There, Judge Mordue found that:

[23]     Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 120.)

The question therefore becomes whether having to choose between attending recreation ... or fulfilling his obligation to pray Salaah in a demonstrative manner would substantially burden plaintiff's religious rights. Although facts produced at trial may show otherwise, the present record, when viewed in the light most favorable to plaintiff, shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

*22 Smith, 2010 U.S. Dist. LEXIS 104660, at *36–37, 2010 WL 3910086, at *12. Judge Mordue's analysis is persuasive and thus the Court finds that there is a triable issue of fact that the Directive substantially burdened Plaintiff's sincere religious beliefs.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Salahuddin, 467 F.3d at 275.

Defendant Rock's declaration discusses, at length, the penological interests on which the Directive is based. Specifically, he declares that:

Demonstrative prayer singles individuals out as members of a particular religious group. This is particularly true of Muslim inmates performing the Salaah, which includes, among other things, kneeling down, bending forward, touching the forehead to the ground, and motioning with the hands and arms. When inmates of a particular faith are involved in an incident, other inmates of the same faith are likely to involve themselves in the incident to protect someone from "their group." Identification of inmates' religious affiliation has also been known to lead to conflicts between different faith groups or different sects within a faith group. These conflicts can escalate rapidly placing staff and other inmates at serious risk of physical injury or death, and threaten the facility's overall security. In the recreation yard, where hundreds of inmates are gathered at one time, this easily could lead to large-scale

violent incidents. During the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison.

Demonstrative prayer in the yard also negatively impacts staff's ability to control inmates. When an inmate is engaged in demonstrative prayer in the recreation yard, that inmate is likely to ignore legitimate direct orders from staff. The inmate praying demonstratively may view the interruption as an insult to his or her religion, and the perceived insult may lead to conflict between staff and the inmate. Staff may be hesitant to interrupt an inmate engaged in demonstrative prayer out of respect for the religious significance of the prayer, and thus be impeded in their attempt to communicate necessary information to the inmate or carry out direct orders or tasks associated with that inmate. This, in turn, disrupts the order of the facility and may adversely impact related safety concerns. As noted above, because the inmate's religion has been identified by his demonstrative prayer, when these conflicts occur, other inmates may join in the conflict, rapidly escalating the situation. Whether the inmate ignores a direct order or staff is unwilling to disrupt prayer, the end result is a diminution of staff's control over the recreation yard and an increased risk to the safety and security of the facility.

*23 I am informed by my attorneys that plaintiff is asserting that these security concerns do not apply to inmates housed in the Behavioral Health Unit (BHU) because they are isolated during recreation periods. However, the fact that inmates in BHU and the Special Housing Unit (SHU) [ ] take recreation in isolated recreation yards does not significantly alter these security and staffing concerns. The recreation yards adjacent to the BHU and SHU are small pens designed for use by one inmate at a time. They abut one another, and although solitary, they are not private and may be observed by other members of the inmate population. Thus, the religious preferences of inmates engaging in demonstrative pray[er] in the BHU and SHU recreation yards would still be identifiable by other inmates, and staff would still have diminished control over inmates praying demonstratively. Moreover, from an administrative perspective, it is better to require staff to apply Directive 4202 across the board to all members of the inmate population without exception. In this way, both staff and inmates know exactly what is allowed and what is not allowed. There are no errors of

discretion, no favors, no favoritism, and no room for inmates in general population to become disruptive as a result of their belief that inmates in BHU or SHU are receiving special privileges.

(Dkt. No. 55–12 ¶¶ 11–34.)

Judge Mordue concluded in *Smith* that the security concerns identified by Defendant Rock satisfied the burden of showing that legitimate penological interests supported the Directive's ban on demonstrative prayer in the recreation yards at Great Meadow. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *41–42, 2010 WL 3910086, at * 14. The undersigned agrees. "Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007).

Therefore, the burden shifts to Plaintiff to show that the concerns articulated by Defendant Rock are irrational. *Salahuddin,* 467 F.3d at 275. When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274–75.

Defendant Rock declares here, as he did in *Smith,* that the Directive's ban on demonstrative prayer in recreation yard at Great Meadow is rational because:

**\*24** Great Meadow's "big recreation yard is approximately 5 acres, and during a typical recreation period, between 100 and 400 inmates are present in the yard, depending on the weather. In the morning, one sergeant and six correction officers are assigned to the yard to supervise the inmates during recreation. In the afternoon, one sergeant and eight correction officers are assigned to the yard and in the evening, one sergeant and twelve correction officers are assigned to the yard. In these large areas of a facility such as the yard or the mess hall, prisoners substantially outnumber staff, and these are areas of a facility where unusual incidents such as serious fights and assaults will typically occur. BHU and SHU recreation periods run on parallel schedules. Fewer staff are assigned because BHU and SHU inmates are released to the yard individually but must be escorted by at least two officers. BHU and SHU populations, even though isolated from the general population, tend to be more unpredictable and difficult to control. These populations often present greater safety and security risks for staff. When an inmate becomes involved in a conflict situation in one area of the facility, staff must be diverted from other areas of the facility to back up the staff assigned to the location where the incident is occurring. During recreation periods the diversion of staff away from more populated areas or escort responsibilities to address incidents with BHU or SHU inmates can be dangerous, and creates critical security concerns. During such incidents, inmates and staff are placed at risk of sustaining serious physical injury or death. Further, during the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may take over the prison. It is imperative, therefore, that rules and regulations designed to minimize the potential for conflict, and the drain on human resources be implemented, across the board, without exception. This is particularly true in the current economic climate as, upon information and belief, there are no resources available to hire additional facility staff, and DOCS is being encouraged to reduce the number of hours that staff may work overtime.

(Dkt. No. 55–12 ¶¶ 36–45.)

In *Smith,* the plaintiff opposed the defendants' motion for summary judgment. In his opposition, the plaintiff argued that the Directive's ban on demonstrative prayer in the recreation yard at Great Meadow was an irrational response to the concerns articulated by Defendant Rock because (1) the Directive contains other provisions explicitly allowing religious behaviors that single out members of particular faith groups, such as wearing distinctive head coverings and facial hair and being served on different colored trays in the mess hall; (2) officers are just as likely to lose control over inmates praying non-demonstratively, which is allowed under the Directive, as they are over inmates praying demonstratively; (3) other activities in the recreation yard—such as sports—also lead to conflict but are permitted; and (4) demonstrative prayer is allowed in the recreation yards at other facilities.

*Smith,* 2010 U.S. Dist. LEXIS 104660, at *42–26, 2010 WL 3910086, at * 14–15. Judge Mordue found that the plaintiff had raised a triable issue of fact that the Directive was an irrational response to the facility's legitimate penological interests. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *47–48, 2010 WL 3910086, at *16.

**\*25** In *Smith,* the plaintiff asserted that the alternatives that the facility offered to praying in the recreation yard—namely, non-demonstrative prayer or staying in his cell at recreation time to pray-were not reasonable. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *48–53, 2010 WL 3910086, at *16–17. Judge Mordue found that the plaintiff had raised a triable issue of fact regarding the reasonableness of the facility's alternatives. *Id.*

In *Smith,* Judge Mordue found that the same issues that raised a triable issue of fact regarding the rationality of the Directive also raised a triable issue regarding the third *Turner* factor, which considers the impact on guards, inmates, and prison resources. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *53–54, 2010 WL 3910086, at *17.

Finally, in *Smith* the plaintiff proposed alternatives to the Directive's ban on demonstrative prayer in the recreation yard-for instances, adding an additional "Go Back" period for Muslim inmates or setting aside an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *54–56, 2010 WL 3910086, at *18. Judge Mordue found that Plaintiff had raised a triable issue of fact that the facility could accommodate Muslims' need to demonstratively pray by designating an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *57–58, 2010 WL 3910086, at *19.

Thus, in *Smith,* Judge Mordue found that there was a triable issue of fact that the very policy challenged by Plaintiff in this case-Great Meadow's implementation of DOCCS Directive 4202(k) banning demonstrative prayer in the recreation yard-violated Muslim inmates' free exercise rights.

However, unlike the plaintiff in *Smith,* Plaintiff here has not opposed Defendants' motion for summary judgment. Thus, Plaintiff here has not met his burden of showing that the concerns articulated by Defendant Rock are irrational.

Even if Plaintiff had opposed the motion and met his burden, Defendants would be entitled to summary judgment on Plaintiff's free exercise claim because (1) the doctrine of qualified immunity shields them from liability for damages; and (2) Plaintiff's request for injunctive relief is moot.

The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)). A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); accord, *Higazy v. Templeton,* 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted). In the context of religion claims, the Supreme Court and the Second Circuit have "expressly cautioned against framing the constitutional right at too broad a level of generality." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The Second Circuit imposes a " 'reasonable specificity' requirement on defining the contours of a constitutional right for qualified immunity purposes." *Id.* Thus, conduct does not violate clearly established rights unless the Supreme Court or the Second Circuit has quite specifically held that conduct is unconstitutional. *Id.*

**\*26** Here, neither the Second Circuit nor the Supreme Court has held that the policy against demonstrative prayer in the solitary recreation pen at Great Meadow Correctional Facility violates prisoners' rights under the First Amendment or RLUIPA. Indeed, *Smith* appears to be the only case on the issue. Even if *Smith* was sufficient to create "clearly established statutory or constitutional rights," it would have no effect here because it was decided after Plaintiff filed this action. Moreover, Judge Mordue dismissed the plaintiff's action in *Smith* on the basis of qualified immunity because "it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard." *Smith,* 2010 U.S. Dist. LEXIS 104660, at *88, 2010

WL 3910086, at *29. Therefore, Defendants are entitled to qualified immunity on Plaintiff's claim for money damages regarding demonstrative prayer.

Defendants argue that Plaintiff's claims for injunctive relief are moot because he is no longer housed at Great Meadow. (Dkt. No. 55–23 at 10–11.) Defendants are correct. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam). Plaintiff has not been housed at Great Meadow since October 2009. (Dkt. No. 7.) Therefore, his request for injunctive relief is moot.

Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's First Amendment claim regarding the ban on demonstrative prayer is granted.

### b. *RLUIPA*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [24] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

[24]   An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

In *Smith,* Judge Mordue found that the plaintiff had raised a triable issue of fact that Great Meadows' ban on demonstrative prayer violated RLUIPA for the same reasons that he articulated regarding the First Amendment. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *58–62, 2010 WL 3910086, at *19–20. However, he found that the defendants were entitled to qualified immunity. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *89, 2010 WL 3910086, at *29.

Here, even if Plaintiff had raised a triable issue of fact, Defendants would be entitled to summary judgment dismissing the RLUIPA claim for two

reasons. First, money damages are not available under RLUIPA. *Sossamon v. Texas,* ––– U.S. ––––, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). Second, as discussed above, Plaintiff's claims for injunctive relief are moot. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's RLUIPA claim regarding the ban on demonstrative prayer is granted.

### 3. *Access to Personal Razor*

**\*27**  Plaintiff alleges that Defendants violated his religious rights by refusing to allow him a razor or clippers to shave his pubic hair and armpits. (Dkt. No. 1 at 19.) Defendants argue that their refusal to give Plaintiff a personal razor is supported by legitimate health and safety concerns because inmates in the SHU and BHU, where Plaintiff resided at Great Meadow, "are there because they have threatened to ... commit suicide, inflict self harm, or because they have assaulted staff or other inmates." (Dkt. No. 55–23 at 27.) Even if Plaintiff had raised a triable issue of fact regarding the merits of this claim, Defendants are entitled to summary judgment on the basis of qualified immunity. The Court can find no Supreme Court or Second Circuit authority holding that prisoners are entitled to possess a personal razor or clippers to perform grooming mandated by their religion. Additionally, as discussed above, Plaintiff's requests for injunctive relief are moot because he is no longer housed at Great Meadow. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

### H. Claim Against Defendant Karandy

Defendants argue that complaint fails to state that Defendant Karandy was personally involved in any of the alleged constitutional violations. (Dkt. No. 52–33 at 11–12.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Here, the complaint includes Defendant Karandy in the list of defendants but does not contain any allegations about any acts or omissions by Defendant

Karandy. (Dkt. No. 1 at 9.) Therefore, I grant Defendants' motion for summary judgment and dismiss the claim against Defendant Karandy.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 55) is ***GRANTED IN PART AND DENIED IN PART.*** All claims are dismissed with the exception of: (1) the excessive force claim against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers; (2) the excessive force claim against Defendants Hamel, Murray, and Stemp; and (3) the claim against

Defendant Segovis regarding the handcuffing incident; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy *Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, 2010 WL 3398156 (S.D.N.Y. May 18, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4478515

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.